STATE of South Dakota, Respondent,

v.

John Thomas MARTIN, Appellant.

No. 12336.

Supreme Court of South Dakota.

Argued Nov. 17, 1978.

Decided Feb. 1, 1979.

Rehearing Denied March 8, 1979.

John P. Guhin, Asst. Atty. Gen., Pierre, for respondent; William J. Janklow, Atty. Gen., Pierre, on the brief.

Ronald E. Brodowicz, Rapid City, for appellant.

MILLER, Circuit Judge.

Appellant was convicted by a Pennington County, South Dakota, jury for the murder of Lena Booth White Hat, an alien from England, and was sentenced to life in the state penitentiary. He had entered pleas of not guilty and not guilty by reason of mental illness.

Appellant has raised several issues in his assignments of error. We conclude that only two of these merit consideration, i. e. questions dealing with the so-called social worker-client privileged communication and the warrantless search of a home.

## FACTS PRESENTED

Lawrence Lawlor, a licensed, certified psychiatric social worker, received a telephone call at approximately 4:45 a.m. on March 19, 1977, from a man who identified himself as John Martin, the appellant. Lawlor testified that he recognized Martin's voice because of several contacts he had had with Martin in his professional capacity.

Martin told Lawlor, "I just killed somebody." After some conversation as to whether Lawlor should go to the Martin house, Lawlor told Martin that he would have to notify the police. Martin indicated that he understood that, and then furnished Lawlor with his address.

Lawlor contacted the Rapid City Police Department and was met by Officer Whittecar who drove him to the Martin house in Rapid Valley. They were met there by Deputy Sheriff Peters who had been dispatched by his office since the Martin home was located outside the Rapid City city limits. During the trip to the Martin house Lawlor advised Whittecar that he had received a telephone call from a man who advised that he had killed someone.

Upon arriving at the Martin house at approximately 5:15 a.m. Lawlor entered the residence alone. Very shortly he returned to advise the officers, "You had better come in. It's been done."

Officer Whittecar and Deputy Peters entered the house and found the body of Mrs. White Hat "submerged in bloody water" in the bathtub. They immediately checked the remainder of the residence. At about this time Martin appeared at the home and stated to one of the officers, "I've had a busy night." He was placed under arrest by Deputy Peters and taken to the county jail.

Other officers were summoned to participate in the investigation. At approximately 7:40 a.m. the pathologist, Dr. Henry, arrived. During this time the remainder of the house was searched and photos were taken of the crime scene, exterior of the house, etc. At approximately 9:00 a.m. the body was removed and taken to the mortuary for an autopsy.

As developed through all of the evidence (including the testimony of Martin's psychiatrist based upon statements made to him by Martin during a psychiatric evaluation) the killing was very brutal. Martin had first met Mrs. White Hat that evening, apparently as the result of picking her up while she was hitchhiking. Some of the evidence, although somewhat contradictory as to times, would indicate that they had gone to a bar, then to a restaurant, and ultimately arrived at the Martin residence. After what respondent's counsel has appropriately characterized as "an unsatisfactory sexual episode," Mrs. White Hat went to sleep and Martin left the bedroom.

He later returned to the bedroom, where he struck Mrs. White Hat with a rolling pin. At some point he struck her in the head with a pickax, which apparently entered some six inches into her skull. He then strangled her with a belt and placed her in the bathtub of water. The pathologist testified that the cause of death was "blunt force injury to the head and strangulation." In his opinion she was dead when placed in the bathtub.

The evidence seemed clear that the bulk of the investigation was done at a time after the appellant had been taken into custody and continued late into the morning. No search warrant was obtained, even though one of the circuit judges had contacted the officers between 8:00 and 9:00 a.m. to advise that he was leaving town and to inquire if they "needed anything."

## ISSUES PRESENTED

(1) Was the telephone conversation between appellant and his psychiatric social worker a privileged communication?

(2) Was the warrantless search of the appellant's house a violation of his constitutional rights?

## DECISION

### PRIVILEGED COMMUNICATION ISSUE.

Appellant and his psychiatric social worker, Lawlor, urge that SDCL 36–26–30 creates a privileged communication which would require the exclusion of the content of their phone conversation at 4:45 a.m. when Martin advised Lawlor that he had killed someone. We disagree.

SDCL 36–26–30 reads:

No licensed certified social worker, social worker, or social work associate or his employee may disclose any information he may have acquired from persons consulting him in his professional capacity that was necessary to enable him to render services in his professional capacity to those persons except:

(1) With the written consent of the person or persons or, in the case of death or disability, of his own personal representative, other person authorized to sue, or the beneficiary of an insurance policy on his life, health, or physical condition;

(2) That a licensed certified social worker, licensed social worker, or licensed social work associate shall not be required to treat as confidential a communication that reveals the contemplation of a crime or a harmful act;

(3) When the person is a minor under the laws of this state and the information acquired by the licensed certified social worker, licensed social worker, or licensed social work associate indicated that the minor was the victim or subject of a crime, the certified social worker, the social worker, or the social work associate may be required to testify fully in any examination, trial, or other proceeding in which the commission of such a crime is the subject of inquiry;

(4) When the person waives the privilege by bringing charges against the licensed certified social worker, social worker, or social work associate.

The state urges, among other things, that since one of Lawlor's principal concerns subsequent to the phone call was that Martin might commit suicide, subsection (2) referring to "a harmful act" is applicable. For reasons set forth below, we need not reach that issue.

■ Martin and Lawlor would have us hold that confidentiality must be inferred merely from their psychiatric social worker-client relationship. It is our holding, however, that the law requires that confidentiality may be inferred only after an examination of the facts and circumstances in each case. The specific language of SDCL 36–26–30 creating the privilege limits it to information disclosed to the social worker "in his professional capacity that was necessary to enable him to render services in his professional capacity to those persons." This would indicate that the legislative intent in the adoption of the act was to require inquiry into the facts and circumstances in each case.

It appears to be settled law that there are four basic and fundamental conditions which must be present to establish a privilege, whether the privilege is set forth by statute or common law, to wit:

1. The communications must originate in a *confidence* that they will not be disclosed.

2. This element of *confidentiality must be essential* to the full and satisfactory maintenance of the relation between the parties.

3. The *relation* must be one which in the opinion of the community ought to be sedulously *fostered.*

4. The *injury* that would insure to the relation by the disclosure of the communication *must be greater than the benefit* thereby gained for the correct disposal of litigation.

8 Wigmore § 2285; 81 Am.Jur.2d "Witnesses" § 141; and *State v. Driscoll*, 53 Wis.2d 699, 193 N.W.2d 851, 50 A.L.R.3d 554 (1972).

There is nothing in the record which would indicate that the conversation was made in confidence or with the expectation of confidentiality. The substance of the conversation would substantiate the lack of confidentiality, or an intent thereof, since Martin advised Lawlor that he understood the need for advising the police before he furnished Lawlor his address.

We can only speculate as to Martin's reasons for contacting Lawlor. Martin's family was out of the state for the weekend—he had just that evening resigned from his part-time employment which had supplemented his income since he was a college student—he had consulted with Lawlor as a patient for six to eight months and apparently had faith in him. Seemingly he wanted to talk with someone. In any event, the conversations offered in this case did not relate to anything material to and did not arise out of their specific relationship.

■ Under the facts here present the specific communication between Martin and Lawlor was not privileged and the circuit judge at the preliminary hearing and the trial court at the trial did not err in allowing it to be received.

In this regard, appellant also complains of certain actions by the trial court which he claims forced him to waive the privilege at the trial. At the preliminary hearing, over repeated objections by appellant's counsel and by Lawlor and his counsel, Circuit Court Judge Young required Lawlor to testify. Appellant sought an intermediate appeal on that issue and this court declined to hear it. At the trial, after additional objections and records were made, Lawlor persistently, if not arrogantly, refused to testify. The trial court specifically advised and admonished the witness at an in camera proceeding. After repeated refusals the trial court quite properly found the witness in contempt. All parties were admonished to not reveal this publicly until after the trial, at which time the court would ascertain the appropriate sanctions.

The trial court then indicated, over timely objections, that the witness's testimony from the preliminary hearing would be read to the jury. Upon reconvening, Martin then waived the privilege so that the witness could testify in person. He urges here that the conduct of the trial court in directing that the preliminary hearing transcript be read in essence forced him to waive the privilege.

■ The trial court was confronted with a witness who improperly refused to testify despite being ordered to do so. The witness had previously testified under oath at a proceeding where appellant had an opportunity to cross-examine him. When considering the posture of the case and the totality of the circumstances before the trial court, we conclude that the court acted properly and that no prejudice resulted to appellant.

## WARRANTLESS SEARCH ISSUE.

It is settled law that a warrantless entry and search, with certain specific exceptions, is unreasonable under the Fourth Amendment of the United States Constitution and Article VI, Section 11 of the South Dakota Constitution. *United States v. United States District Court*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); and *Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970).

Equally settled law is the proposition that warrantless searches are permissible in emergency situations. *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *Maryland Penitentiary v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Mincy v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

In *Terry v. Ohio*, supra, the Court held:
[I]t is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure and the search 'war-

rant a man of reasonable caution in the belief" that the action taken was appropriate? (Emphasis supplied) 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906

It is our holding that the initial entry of the Martin home was not unreasonable, illegal or unconstitutional. The officers were acting in an emergency situation which fully justified them in entering the house and making a search not only for the decedent but also to investigate to ascertain whether other dead bodies or dangers were apparent.

The question then arises whether they were justified in continuing the search over a longer period of time without the benefit of a search warrant. Under the facts here it is our holding that the fruits of the search, and specifically the articles that caused the death, were legally seized. The evidence is clear that at the initial entry the pickax and rolling pin were in plain view and observed by Officer Whittecar, and Deputy Peters, as well as by the officers and pathologist who later arrived. The Court in *Coolidge v. New Hampshire,* supra, said:

> Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate. 403 U.S. at 465, 91 S.Ct. at 2037, 29 L.Ed.2d at 582

In a case not greatly dissimilar in its facts the Missouri Supreme Court in the case of *State v. Epperson,* 571 S.W.2d 260 (Mo.1978), said that the property could be seized:

> . . . if such evidence was readily observable and was discovered inadvertently rather than by anticipation or by a concerted search, and was immediately recognized as evidence of a crime. 571 S.W.2d at 265

It is our holding that the items which were in plain view upon the initial entry of the officers, and specifically the death weapons (rolling pin and pickax), are admissible.

As to items seized later in the morning by the officers we similarly find them admissible. This would include fingerprints, blood samples, articles removed from the washing machine, etc. These items were "no more than an actual continuation of the first [search], and lack of a [search] warrant did not invalidate the resulting seizure of the evidence." *Michigan v. Tyler,* 436 U.S. 499, 511, 98 S.Ct. 1942, 1951, 56 L.Ed.2d 486, 499 (1978).

We have considered other issues raised by appellant and find them to be without merit.

Judgment affirmed.

WOLLMAN, C. J., and DUNN, J., concur.

MORGAN, J., concurs specially.

MILLER, Circuit Judge, sitting for ZASTROW, J., who was a member of the Court at the time this case was orally argued.

HENDERSON and FOSHEIM, JJ., not having been members of the Court at the time this case was orally argued, did not participate.

MORGAN, Justice (concurring specially).

I concur in the majority holding as to the first issue discussed and in the holding as to the second issue so far as the right of the original entry without a warrant and the admissibility of evidence in plain view at that time. However, I would save the question as to admissibility of the balance of the evidence for another time when it is properly before us. I would hold in that regard that defendant failed to properly raise the issue of scope of search before the trial court. *State v. Halverson,* 87 S.D. 110, 203 N.W.2d 421 (1973).

*Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) deals with an arson investigation and search for cause of a fire, not a murder, the cause of which was immediately apparent. Nor does *Michigan v. Tyler,* supra, grant an unlimited right of reentry but rather a very limited one which is not fully explained in the majority opinion.