*181 OPINION OF THE COURT
Albert M. Rosenblatt, J.
What are the statutory and ethical obligations of an attorney who receives a telephone call from a friend who.states that he has just killed someone and is about to take his own life? May the divulgence, under any circumstances, be disclosed, and if so, to whom, and with what consequences? The defendant argues that attorney-client confidentiality in this instance is. absolute, and that any disclosure which, directly or indirectly, leads to a discovery of the body and evidence, mandates dismissal of an indictment.
The defendant stands indicted for intentional murder (Penal Law, § 125.25, subd 1). While the facts adduced before the Grand Jury are sufficient to establish the crime, the defendant avers that the indictment must be dismissed because it is the product of tainted and inadmissible evidence, presented in violation of the attorney-client privilege, as codified in CPLR 4503.
The attorneys for both sides have asserted that the case is unprecedented in American legal annals. This court’s research has not uncovered any opinion involving the confluence of an alleged breach of confidence by one’s own attorney and the applicability of an exclusionary statute as a proposed remedy.
The defendant asserts that he contacted Wallace Schwartz, and in quest of legal advice, confided to him the facts regarding the event, and that the attorney called his own mother, who, in turn, called the defendant and then the police, as a result of which the defendant was arrested, and the body of the victim discovered in his home. He maintains that the disclosures were unauthorized, that the evidence presented to the Grand Jury flowed from the breach of confidentiality which he never waived, and that CPLR 4503 precludes the use, directly or derivatively, of any evidence obtained in violation of the attorney-client privilege. In short, he contends that the alleged breach of confidentiality immunizes him from criminal responsibility.
The case presents issues at the root of the attorney-client relationship, the professional duty of confidentiality, the concept of waiver, the statutory prohibitions, and the vexing ethical and moral dilemmas which marked the episode itself.
CPLR 4503 reads as follows: "§ 4503. Attorney, (a) Confiden *182 tial communication privileged; non-judicial proceedings. Unless the client waives the privilege, an attorney or his employee, or any person who obtains without the knowledge of the client evidence of a confidential communication made between the attorney or his employee and the client in the course of professional employment, shall not disclose, or be allowed to disclose such communication, nor shall the client be compelled to disclose such communication, in any action, disciplinary trial or hearing, or administrative action, proceeding or hearing conducted by or on behalf of any state, municipal or local governmental agency or by the legislature or any committee or body thereof. Evidence of any such communication obtained by any such person, and evidence resulting therefrom, shall not be disclosed by any state, municipal or local governmental agency or by the legislature or any committee or body thereof.” (Emphasis added.)
Upon the italicized language, the defendant bases his contention that the indictment rests on proof "resulting” from the breach, but for which there would have been no arrest, discovery of evidence, or indictment. CPLR 4503, by virtue of CPL 60.10, is made applicable to criminal actions (People v Hitchman, 70 AD2d 695).
Because the motion is addressed to the sufficiency of legal proof before the Grand Jury, it has been necessary to hear witnesses (CPL 210.45, subd 6), in order to factually determine whether an attorney-client relationship was born, whether the utterances were made within its lifetime and parameters, and if so, whether a seal of contemplated secrecy was broken by Wallace Schwartz, or by the defendant’s own acts, thereby constituting a waiver.
I
THE HEARING
The defendant is correctly cognizant of his burden of proof to demonstrate the insufficiency of the Grand Jury proof upon a motion to dismiss (CPL 210.45, subd 7; People v Scroggins, 56 AD2d 856), as well as his task of establishing the existence of a privileged relationship (Rosseau v Bleau, 131 NY 177, 183; Bankers’ Money Order Assn. v Nachod, 120 App Div 732, 733), the facts to justify its recognition by the court (Bloodgood v Lynch, 293 NY 308, 314; Randy Int. v Automatic Compactor Corp., 97 Misc 2d 977, 981), and the existence of *183 the prerequisites for its operability (Fisch, New York Evidence, §§ 22, 518; People v Doe, 99 Misc 2d 411).
At the outset, he expressed grave concern about negotiating the mine field through which he could present proof of an alleged breach by the former attorney, Wallace Schwartz, without waiving the very confidentiality of the communications themselves. The paradox involves the proposed introduction of proof of an allegedly confidential consultation, in order to establish its ensuing and allegedly unauthorized disclosure by Wallace Schwartz, as against the risk that its presentation in court would, by waiver, pave the way for its use at a trial of the indictment in the event the dismissal motion fails.
As a general rule, a defendant in the exercise of one right, may not be compelled to forego another (Simmons v United States, 390 US 377, 394). The waiver doctrine has been invoked when the defendant directly or through his witness exposes the confidences (People v Bloom, 193 NY 1; Richardson, Evidence [10th ed], § 438). To resolve the quandary, both sides expressly consented to a prohibition against any use by the prosecution, on its case-in-chief at trial, of any allegedly confidential statements adduced at the hearing. In that manner, the defendant would surrender nothing in the exercise of his right (and burden) to attempt to prove the violation of CPLR 4503, while the People would be permitted, at the trial, to use testimony adduced at the hearing, for impeachment or rebuttal purposes only, analogous to the rule in Harris v New York (401 US 222). The format is comparable to the security afforded a defendant who may testify at a Huntley hearing without risking cross-examination on the merits and the introduction of that testimony offered against him at the trial (People v Lacy, 25 AD2d 788).
FINDINGS OF FACT
Albert Fentress was a schoolteacher in the City of Poughkeepsie school system.
Among his colleagues there for more than a decade was Enid Schwartz, a fellow teacher and personal friend, whom Fentress visited at her home once or twice yearly. Her friendship with Fentress was substantial, and was based on his having taught two of her children, as well as on the independent basis of their relationships as colleagues over the years.
One of these sons, Wallace, had been taught by Fentress in *184 the ninth grade, and through the years had developed an independent personal friendship with him. After graduating, Wallace Schwartz and Fentress visited at each others’ homes and had engaged in sports together.
After Wallace graduated from law school, and joined a civil firm in New York City, he gave Fentress his card and told him that he could call him at any time. On August 20, 1979, the court finds the following to have occurred:
2:12 a.m. Fentress, from his home at 216 Grand Avenue in Poughkeepsie, called Wallace Schwartz at the latter’s home in Hartsdale, Westchester County. The first thing that Fentress said was that he was about to kill himself. Fentress spoke in a low monotone, and was distraught, but coherent. He told Schwartz that he had just killed someone, that a terrible thing had happened, which he could not square with God, and that he was going to kill himself.
Incredulous, Wallace Schwartz said it must have been an accident, but was told it was not, and that there had been a sexual mutilation as well.
In continuing attempts to dissuade his valued friend from suicide, Wallace Schwartz told Fentress that suicide would not square anything with God, and that whatever had happened, Fentress could get help. Wallace Schwartz invited Fentress to his house, and offered to go to Fentress’ house, but Fentress refused.
Wallace Schwartz then suggested various persons who might be able to call and stay with Fentress, all of whom were rejected. However, later in the conversation Fentress said he would like the local rabbi, Rabbi Zimet, to come to his house, and asked Wallace Schwartz to call the rabbi for him, which Wallace Schwartz agreed to do immediately. Fentress said he would leave the door open, and wait for the rabbi. It was also agreed that the police be summoned. (See point IV, infra.)
Schwart testified that it was his "legal” advice to Fentress that the police be called.
Fentress agreed, and stated that he would like to have both Wallace Schwartz and the rabbi present when the police arrived. (See point IV, infra.)
At this point, of course, Schwartz did not have firsthand knowledge of the facts, but, recognizing the urgent need for immediate action (he could not fully conclude that any victim *185 was actually dead) and because he was some 50 miles away, he immediately attempted to arrange to contact the rabbi.[1]
2:40 a.m. Wallace Schwartz called his mother, Enid Schwartz, who lived in Poughkeepsie, to enlist her aid in calling the rabbi and arranging for him to go to Fentress’ house.
Wallace Schwartz told Enid of the call he had just received, and of his extreme anxiety about Fentress having said that there had been a killing, or that he had killed someone, and that he was going to kill himself, and wanted Rabbi Zimet to come to see him. Enid, herself a close friend of Fentress, agreed to call the rabbi but said she was going to call Albert Fentress first to verify that there was a real problem there.
2:45 a.m. As soon as Enid hung up, she called and asked Fentress what had happened. He told her either that he had killed someone, or that there had been a killing.
Notably, she never told Fentress that Wallace Schwartz had revealed to her any of the substance of the conversation between Fentress and Wallace Schwartz.
When Enid telephoned Fentress she did not state or imply, nor could she have concluded, that Fentress had committed a crime. She knew, from Wallace, that Fentress may have killed someone, but she could not have concluded whether it was self-defense or the justifiable killing of an intruder, or willful murder. Her overriding concern was for the preservation of the life of her friend, Albert Fentress. When she began the conversation by asking Fentress what happened, Fentress stated that there had been a killing.
During the 2:45 a.m. conversation, Enid told Fentress that the police must be called, saying either "You must call the police” or "I am going to call the police.” Fentress’ response was that he would like Rabbi Zimet there waiting until the police came. She got the understanding that Albert Fentress acknowledged that it was proper for the police to come. (See point V, infra.)
Notably, Fentress did not state that he wanted his attorney *186 there, only the rabbi. This is important, in that Fentress recognized that the presence of an attorney in the case would not (or should not) stem the arrival of the police. The court thus finds that Fentress agreed that the police be called, and further, that he did not attempt to place any condition, as to the presence of an attorney, on their being called. His wish for a rabbi, while understandable for purposes of spiritual comfort, has no legal implications whatever.
2:50 a.m. After Enid spoke to Fentress, she immediately called Rabbi Zimet but there was no answer.
While Fentress had asked her to let him know if she reached the rabbi, she was fearful that if she informed him of her failure, he might carry out his suicide threat.
It was because she could not reach the rabbi that she decided to call the police, to protect Fentress from harming himself.
2:59 a.m. Enid Schwartz called her son Wallace, to tell him of her unsuccessful attempts to reach the rabbi, and her intention to call the police. The court finds that the decision to call the police was made by Enid alone, although Wallace Schwartz concurred in it, principally because they both wished to prevent the defendant’s suicide. Because of Wallace Schwartz’ concern for Fentress’ (legal) position, he cautioned his mother to be discreet in what she told the police, and to limit her remarks to the effect that there may have been a shooting at Fentress’ house, and that there was fear that Fentress might commit suicide.
3:05 a.m. Enid called the police and told Officer Thomas Ghee that it was reported to her by her son, and then by Fentress, that there had been a shooting or killing at his home. She warned the police that because of Fentress’ alleged suicidal intentions, it would be unwise to approach with sirens.
3:15 a.m. The police, dispatched by Sgt. Krauer, arrived at defendant’s house. The lights were on and the door open. Fentress was seated next to an open window, and beckoned: "Officer, please come in and take the gun.”
3:19 a.m. The defendant was given his Miranda warnings, according to Officer Perkins. The defendant declined to speak, stating that he was "waiting for his attorney,” whom "he had already contacted,” and whom he was expecting shortly. The police desisted questioning.
*187 3:30 a.m. Fentress was driven to the police station, and told the police that his attorney was Wallace Schwartz. After arriving at the police station, Fentress, on three or four occasions, asked for "his attorney, Wallace Schwartz.”
5:09 a.m. Wallace Schwartz arrived in Poughkeepsie, and advised the police that he was not a criminal lawyer and would not be able to properly represent the defendant. By that time Wallace Schwartz had decided to recommend Peter L. Maroulis to the defendant.
5:30 a.m. Peter L. Maroulis telephoned the police, and instructed them not to question the defendant. They had not; they did not.
As additional findings of facts, the court further concludes that:
(1) At no time before the arrest did Wallace Schwartz ever tell Fentress that he was representing him or that he was not representing him in the matter. The conversation, understandably, dealt with more immediate affairs.
(2) Wallace Schwartz never told the police how he wanted them to deal with Fentress regarding questioning, procedures, or the like.
(3) Although Wallace Schwartz never for a moment envisioned himself as being Fentress’ attorney of record in this case, Fentress, in speaking to Wallace Schwartz during the 2:10 a.m. phone call, spoke to him as a friend and as an attorney, and the disclosures to Wallace Schwartz are within the attorney-client privilege.
(4) When Enid made the decision to call Fentress at 2:45 a.m., she did so on her own, independently, and, in calling, did not act as the agent of Wallace Schwartz.
(5) Fentress’ disclosures to Enid during the 2:45 a.m. conversation, were voluntarily and independently made, without duress, pressure, or exploitation of any kind. Fentress made those disclosures without any knowledge that Enid already knew (through her conversation with Wallace Schwartz) what had occurred, and absent any subjective thoughts that disclosure, to Enid was on constraint of or a necessary concomitant of his earlier statements to Wallace Schwartz. These disclosures to Enid were totally attenuated from those earlier disclosures to Wallace Schwartz. Wallace Schwartz never told Fentress that he was going to communicate with Enid. This is a significant omission, supportive of *188 the factual conclusion that Fentress, when responding to Enid’s inquiry as to "what happened,” removed the conversation from the ambit of any pre-existing attorney-client confidentiality which had been formed at his 2:12 a.m. conversation with Wallace Schwartz. The omission, among other things, eviscerates defendant’s claim that for purposes of the attorney-client relationship, Enid was Wallace’s agent.
(6) The disclosures by Fentress to Enid Schwartz were not within the scope of the attorney-client privilege.
(7) During the 2:45 a.m. conversation with Enid, Fentress voluntarily consented that the police be called.
CONCLUSIONS OF LAW
It is useful to begin with a general discussion of the attorney-client privilege, its origins, purposes, and application to the case at bar.
The basis for the preservation of attorney-client confidentiality dates back to at least the Roman era (Radin, The Privilege of Confidential Communication Between Lawyer and Client, 16 Cal L Rev 487). In England, by the time of Elizabeth I, the evidentiary privilege against disclosure appears to have been unquestioned (Note, The Attorney-Client Privilege: Fixed Rules, Balancing, and Constitutional Entitlement, 91 Harv L Rev 464). It evolved from a concept assuring the sanctity of the attorney’s honor, into a highly functional concern for the encouragement of unrestrained communication by laymen, so that they might, without fear of betrayal, conduct their affairs through the hands of skilled practitioners (Note, The Lawyer-Client Privilege: Its Application to Corporations, the Role of Ethics, and Its Possible Curtailment, 56 Northwestern L Rev 235). By the last quarter of the 18th century, this rationale became the exclusive justification for the preservation of confidentiality, although, to be sure, the earlier underpinnings remain, particularly where the attorney’s obligation rests on the ethical duty[2] as opposed to the privilege against compelled disclosure.
*189 We may take it that if an attorney-client relationship was created, the right to insist on any confidentiality belonged not to Wallace Schwartz, as it once might have, but to Albert Fentress (Matter of Cunnion, 201 NY 123; People v Patrick, 182 NY 131, 175).
The primary issues to be decided are, therefore, whether the requisites for confidentiality were established, and if so, whether they were waived by Fentress.
Wigmore, as usual, is an apt starting place, and provides the most orderly formulation of the rule (8 Wigmore, Evidence, [McNaughton rev], § 2292):
"(1) Where legal advice of any kind is sought
"(2) from a professional legal adviser in his capacity as such,
"(3) the communications relating to that purpose,
"(4) made in confidence
"(5) by the client,
"(6) are at his instance permanently protected
"(7) from disclosure by himself or by the legal adviser,
"(8) except the protection be waived.”
II
WALLACE SCHWARTZ’ PROFESSIONAL CAPACITY
If Wallace Schwartz was not being consulted in a professional capacity for legal advice, the inquiry is at an end. Fentress’ contention would fail because a prime component of the statutory (and Wigmorian) relationship is lacking (Matter of Kaplan [Blumenfeld], 8 NY2d 214). The District Attorney argues that Wallace Schwartz was predominantly a friend, who never handled a criminal case, and was neither retained nor gave any appreciable amount of legal advice to the defendant. To be sure, he "withdrew” in favor of Mr. Maroulis at the earliest time, and made no secret of his discomfort in the unfamiliar surroundings of the criminal law.
It is well settled, however, that the professional relationship may exist in a financial vacuum, and that the absence of a fee or retainer does not alone destroy it (People v Arroyave, 49 NY2d 264; Bacon v Frisbie, 80 NY 394; Gage v Gage, 13 App Div 565).
Under any view, the defendant and Wallace Schwartz were friends. And while there would be no privilege if Wallace *190 Schwartz was acting solely as a friend, abjuring professional involvement (Kitz v Buckmaster, 45 App Div 283, mot for lv to app den 47 App Div 633), it may be inferred that the defendant communicated with Wallace Schwartz because he was not only a friend but an attorney, from whom he was seeking support, advice, and guidance. That Wallace Schwartz was in effect called upon to serve as psychologist, therapist, counselor, and friend, does not derogate from his role as lawyer (Note, Functional Overlap Between the Lawyer and Other Professionals: Its Implications for the Privileged Communications Doctrine, 71 Yale LJ 1226, at p 1252).
Fentress told the police on several occasions that he had an attorney, Wallace Schwartz, and was eagerly awaiting his arrival. It is indicative of his own subjective and articulated belief that he contacted his friend, Wallace Schwartz, qua attorney (Nichols v Village Voice, 99 Misc 2d 822) but did not, and could not have concluded that their conversation was to be kept confidential in all respects.
Ill
THE LEGAL ADVICE
Fentress urges, as he must to fit within CPLR 4503, that his call was for "legal advice.” Ironically, the only "legal advice” which he can identify — and the court adopts it as such — is the advice that the police must be called, the very advice which Fentress is now trying to disown. He cannot have it both ways.
Wallace Schwartz’ advice was not the least bit unprofessional. Even the most seasoned criminal lawyers often "legally advise” their clients to turn themselves in for reasons which are strategic, if not moral. An experienced criminal practitioner might, of course, refrain from making that suggestion and still be on arguably stable grounds (both legally and ethically, despite the existence of an undetected body),[3] but he would have to weigh the risk of its ultimate discovery, and the disdain of a jury for any defense interposed by someone who had the cunning to suppress the corpus delicti. Duplicity is not tactically sound "legal advice.” What other "legal advice” could Wallace Schwartz have given?
*191 Had Schwartz affirmatively advised Fentress to conceal or dispose of the body, he would have been counseling the commission of a crime (Penal Law, § 215.40, subd 2, impeding the discovery of evidence; People v De Felice, 282 App Div 514) which involves professional actions beyond those found endurable in Beige (supra). They are violative of Disciplinary Rule 1-102 (subd [A], pars [4], [5]) of the Code of Professional Responsibility, and may thus demolish the attorney-client privilege itself.[4] According to Ethical Consideration 7-5 of the Code of Professional Responsibility, "A laywer should never encourage or aid his client to commit criminal acts or counsel his client on how to violate the law and avoid punishment therefor.”
IV
NONCONFIDENTIALITY
Not every communication made to a lawyer in his professional capacity is confidential or intended to be so. As a general rule the question of privileged confidentiality depends on the circumstances (Doheny v Lacy, 168 NY 213, 233; Wallace v Wallace, 216 NY 28, 36; Matter of Kaplan [Blumenfeld], 8 NY2d 214, supra; People v Beige, 59 AD2d 307). Fentress’ intentions and his reasonable expectations of confidentiality or disclosure, as expressed and inferred from his conversations are of critical importance. (See Sedler and Simeone, The Realities of Attorney-Client Confidences, 24 Ohio State LJ 1, at p 26.) Fentress, when he spoke to Wallace Schwartz at 2:12 a.m., imparted the killing, and his suicidal intentions. Wallace Schwartz told him, and he agreed, that *192 the police would have to be called. According to testimony of Wallace Schwartz:
"A1 [Fentress] indicated that he would leave the door open for the rabbi, that the rabbi can come over, and that he would wait for the rabbi, and that at that time I, meaning me, could call the police * * * I wanted to make sure that A1 understood what I intended to do.
"Towards the end of the conversation the police were [again] mentioned in relation to his waiting for me with the rabbi. I believe at that time it was A1 that mentioned that I could call the police at that time.”
The conclusion is inescapable, and the court has found as a fact, that Fentress did not intend to keep the corpus of the crime from the police. His renunciation of confidentiality (as to the fact of the homicide) appeared again when Enid suggested that the police be called, and Fentress again specifically disavowed any expectation of keeping the fact of the homicide from the police. Enid’s testimony confirms it, and the court has adopted as a fact, the defendant’s expectations of nonconfidentiálity regarding the corpus:
"Q: He expected the police to come?
"A: I don’t know what he expected. That’s what he said to me.”
While he may have wanted the rabbi there first, that desire relates merely to chronology and does not affect its inevitable disclosure. By suggesting a sequence of events, Fentress did not revoke his plainly stated agreement that the fact of the homicide was to be divulged to the police. The case, in this regard, is similar to State v Martin (— SD — 274 NW2d 893).
In Martin (supra), defendant telephoned his social worker and told him that he had just killed someone. (Under South Dakota law confidential communications to social worker, in a professional context, are privileged.) The court held (— SD, at p —; 274 NW2d, at p 896), inter alla, that no confidentiality was intended by defendant because: "There is nothing in the record which would indicate that the conversation was made in confidence or with the expectation of confidentiality. The substance of the conversation would substantiate the lack of confidentiality, or an intent thereof, since Martin advised Lawlor that he understood the need for advising the police before he furnished Lawlor his address.”
When Fentress concurred in the decision to call the police, *193 he waived confidentiality of the corpus. Both to Wallace Schwartz and Enid Schwartz, he knew that disclosure to the police was inevitable both from his viewpoint and from the advice he received from his attorney, and later, from his friend, Enid Schwartz. His express eschewal of confidentiality is controlling (Rosseau v Bleau, 131 NY 177, 183, supra). "If the communication is made to an attorney with the knowledge and intent that it be disclosed to a third person it is fairly clear that it was not meant to be kept confidential and it is therefore not privileged.” (5 Weinstein-Korn-Miller, NY Civ Prac, par 4503.18, pp 45-142, 45-143; see, also, Finn v Morgan, 46 AD2d 229, 235.)
There is more here than mere waiver by implication (Richardson, Evidence [10th ed], § 418).[5] Here we have the converse, the avowed intention, on the client’s part, to have the fact of homicide revealed to the police.
It was not unrealistic of Fentress to adopt that stance. While, theoretically, he could have attempted to secrete the body forever, or to actively impede its recovery, both would involve criminal acts. We cannot assume that he would commit those crimes, when on the strength of this record, his expressed inclination was to the contrary.
One test is: would he have told Wallace Schwartz of the killing if he knew that the police would have to be called? The answer is clearly yes, on the basis of the hearing testimony.
V
AGENCY AND WAIVER
After the 2:12 a.m. conversation between Fentress and Wallace Schwartz, and the 2:40 a.m. conversation between Wallace Schwartz and Enid, Fentress received a telephone call from Enid at 2:45 a.m. She did not tell Fentress that Wallace Schwartz had related to her any admissions that Fentress made to Wallace Schwartz. She began immediately by asking Fentress what happened, and he then told her that there had been a killing. They both then agreed that the police would *194 have to be summoned (see point IV, supra), with Fentress stating that he wanted her to call Rabbi Zimet.[6]
At this point, for reasons which are expanded upon below, the court finds that the conversation between Fentress and Enid, in which he divulged the killing, was a communication made independently freely by Fentress to Enid, a friend and teaching colleague whom he had known for 10 years. He did not make the disclosure on the belief or expectation that Enid was an extension of Wallace Schwartz, qua attorney, or under the impression that she was Wallace Schwartz’ agent for purposes of any attorney-client confidentiality.
The court has found as a fact that Fentress’ disclosure to her was not prompted on constraint of any previous disclosure that he made to Wallace Schwartz, but was independent of it, causally disconnected, and in response to a question by a friend who did not intimate to him that she was privy to any actual facts regarding his actions (United States v Bayer, 331 US 532, 540; People v Tanner, 30 NY2d 102, 106; People v Jennings, 33 NY2d 880). The little that Enid knew — of a highly ambiguous nature — she did not disclose to Fentress and he could not have reasonably believed that she was privy to any incriminating facts merely from her inquiry, apprehensive though it was, as to "what happened.” When Fentress replied, and told her that he killed someone, no confidentiality existed or was intended by him and any previous attorney-client privilege which may have been created by the (2:12 a.m.) call between Fentress and Wallace Schwartz had been broken and attenuated. Thus, the evidence before the Grand Jury was not the "result” of any breach of attorney-client confidentiality within the meaning of CPLR 4503 even if, arguendo, complete confidentiality between Fentress and Wallace Schwartz was intended. This conclusion is confirmed by Fentress’ repeated recognition and statements to Enid that the police were to be summoned. Hence, Enid was under no legal or ethical duty to refrain from calling the police. She had not only the defendant’s express approval to do so, but her own unilateral and unfettered choice in the matter, just *195 as any person is free to call the police when a friend has confided that he has killed someone and is about to kill himself.
Though the first disclosure by Fentress to Wallace Schwartz was not eradicated or eradicable, its existence did not poison or induce the later divulgence to Enid. A repeated disclosure will be either induced by or divorced from the first, depending on circumstances. Here, the court has found that it was independent, and not derivative, within CPLR 4503. The independent and long-standing friendship between Fentress and Enid, his concurrence with her in summoning the police, his wish for the presence of a rabbi to be there when the police arrived, and the absence of any exploitation or even mention by Enid of the content of Fentress’ first disclosure to Wallace Schwartz, all lead to inexorable factual conclusions that Fentress’ revelations to Enid were made on an independent footing, bereft of any nexus (save chronological) with the utterances he made to Wallace Schwartz. Thus, even if Wallace Schwartz had told Enid that Fentress willfully murdered someone, the result would be the same, because nothing Enid said to Fentress amounted to or may be construed as compulsion, exploitation, domination, or inducement, particularly where Fentress was speaking to her as a friend. (Cf. United States v Bayer, 331 US 532, supra; People v Jennings, 33 NY2d 880, supra; People v Tanner, 30 NY2d 102, supra.)
The advice later given by Wallace Schwartz to his mother, Enid, at 2:59 a.m., that she should be discreet in what she tells the police because there "may” be an attorney-client privilege, did not and does not alter the relationship between Fentress and Enid. To the extent that there was an attorney-client relationship between Fentress and Wallace Schwartz, Enid was no part of it, nor was she in any manner acting as her son’s agent, qua attorney. After her conversation with Fen-tress at 2:40 a.m., she was entirely free to call the police on her own for the reasons given. It is hard to conceive of anyone doing otherwise.
The defendant recognizes that the presence of an unnecessary third party will destroy confidentiality. (People v Buchanan, 145 NY 1, writ den sub nom. Matter of Buchanan, 158 US 31.) The waiver doctrine, however, is applied not only when a third nonindispensable person is present, but when such a person is let in on the secret before (Workman, v Boylan Buick, 36 AD2d 978), during (People v Buchanan, *196 supra) or after the attorney-client consultation. Thus, when the client, after consultation, reveals the contents of the consultation to someone else a waiver is effectuated (People v Hitchman, 70 AD2d 695). This is not new, and represents the unswerving application of the waiver doctrine on the basis of voluntary disclosures made by clients to third persons after the initial consultation. (People v Farmer, 194 NY 251; Yordan v Hess, 13 Johns 492; 5 Weinstein-Korn-Miller, NY Civ Prac, par 4503.18, pp 45-142, 45-143.)
Enid was not a person whose participation was necessary for furtherance of the professional relationship. Had she been present during the 2:12 a.m. conversation, her role as a friend could not be transmuted into that of an attorney’s agent[7] or be perceived as essential to or in furtherance of the attorney-client conference (Baumann v Steingester, 213 NY 328, 332).
That Fentress later told Enid of the killing, rather than contemporaneously, weakens, rather than strengthens his position. Her initial nonparticipation, followed by Fentress’ repetition of the admission to her puts the disclosure on a more independent basis, made because of his enduring and self-sustaining friendship with her.
The court has examined a thorough documentation of the history of the statutory amendments to CPLR 4503 as prompted by Lanza v New York State Joint Legislative Committee on Govt. Operations (3 NY2d 92; see, also, Austin, The Use of Privileged Communications for Impeachment Purposes, 49 NY State Bar J, Nov., 1977, p 564; Dec., 1977, p 657).
A plain reading of the statute shows that it does not apply to the disclosures by Fentress to Enid Schwartz, a third party and nonemployee (nonagent) of an attorney, which were made not only with the knowledge of the "client,” but, indeed, directly by him to her. Because the "communication” at issue does not come within the ambit of the definition in the first sentence of CPLR 4503 (subd [a]), any "evidence” which followed the divulgence could not be "evidence * * * resulting therefrom” within the meaning of the second sentence.
*197 VI
SUICIDE
The defendant’s announced suicidal intentions pervade the case. Wallace Schwartz was burdened with a trilemma. He had just been told of a frightful homicide and an undiscovered victim. Secondly, Fentress said he was about to take a second life, his own. Given the desperation of the call, it would not have been possible for Wallace Schwartz, or anyone else, to determine whether the victim was still alive or beyond all hope. Fentress had mentioned drinking and a sexual mutilation as well. Schwartz could not possibly travel quickly enough to save anyone’s life, but he knew that lives were in serious jeopardy at the very least. The implication of Fentress’ motion is that Wallace Schwartz somehow broke a confidence by telephoning his parents, who lived moments away from Fentress, who was their friend as well, for the express purpose of complying with Fentress’ request that Rabbi Zimet be summoned to the scene, and to avert a suicide.
The ethical oath of secrecy must be measured by common sense. It is one thing to act as did Francis Beige (People v Beige, 83 Misc 2d 186, supra) and to withhold knowledge of the whereabouts of victims’ remains. There, the agonizing silence, held in the name of privilege, was finally pierced to the shock and outrage of many who would substitute pragmatism for ethical abstractionism. At least there it could be said that in hiding bodies behind a privilege, no life was endangered, although the anguish of the victims’ family must have been excruciating. Here, Wallace Schwartz was confronted not only with the vexing moral and ethical predicament which faced Beige, but with one, and possibly two lives, still hanging, literally, in the balance.
To exalt the oath of silence, in the face of imminent death, would, under these circumstances, be not only morally reprehensible, but ethically unsound. As Professor Monroe Freedman reminds us, "At one extreme, it seems clear that the lawyer should reveal information necessary to save a life.” (10 Grim L Bull, No. 10, p 987.) If the ethical duty exists primarily to protect the client’s interests, what interest can there be superior to the client’s life itself?
The issue was addressed in New York State Bar Opinion 486 (50 NY State Bar J, Aug., 1978, pp 441-444). Posing the question "May a lawyer disclose his client’s expressed inten *198 tian to commit suicide?” the New York State Bar Association, in interpreting Ethical Consideration 4-2 and Disciplinary Rule 4-101 (subd C, par [3]) of the Code of Professional Responsibility answered in the affirmative, despite the repeal of suicide as a crime (see L 1919, ch 414; former Penal Law, § 2301; Meacham v New York State Mut. Benefít Assn., 120 NY 237, 242).
Thus, even if the defendant flatly forbade Wallace Schwartz from calling the police, the ethical duty of silence would be of dubious operability. We need not decide the legal consequences of such an interdiction, having rejected the defendant’s contention that he did not acquiesce in the call to the police, and having found waiver by repetition to Enid Schwartz.
It seems safe to say, however, that Wallace Schwartz acted with exemplary fidelity to his client, and to his moral responsibilities to society, by doing as he did, in offering the advice which the defendant patently accepted. He steered the prescribed ethical course fastidiously, as if he had the very words of the ethics opinion before him, by offering his client help, and then by suggesting that the police be called, in order that his life be saved. So far as this court is concerned, his actions have been vindicated, utterly. Had he acted any differently, he would have blindly and unpardonably converted a valued ethical duty into a caricature, a mockery of justice and life itself..
In conclusion, the court holds that the indictment is based on legally sufficient and competent evidence within the meaning of CPL 190.65, 210.20, 210.25 and 210.30, and CPLR 4503. Accordingly, the motion to dismiss the indictment is denied.
Lastly, the court expresses its gratitude to both attorneys for their excellent briefs and presentations.

. It should be noted, at this point, that Fentress was not and is not Jewish. While there was some peripheral discussion at the hearing about the possible clergyman-penitent relationship, the court finds it lacking. Rabbi Zimet, as it turned out, could not be reached, and through no one’s fault never appeared at defendant’s house or spoke to the defendant. The only connection between the defendant and the rabbi is that they both were at Wallace Schwartz’ wedding where, one may speculate, they may have met.

. The "privilege” is codified in CPLR 4503. For the ethical duty to preserve secrets of a client, see Disciplinary Rule 4-101 of the Code of Professional Responsibility. The distinction between the ethical duty to keep clients’ secrets and the reliance upon the more limited privilege to resist compelled disclosure is discussed in Functional Overlap Between the Lawyer and Other Professionals: Its Implications for the Privileged Communcations Doctrine (71 Yale LJ 1226, at pp 1238-1239) and in J. F. Chamberlain’s, Legal Ethics, Confidentiality and The Case of Robert Garrow’s Lawyers (25 Buffalo L Rev 211, at p 216).

. People v Beige, 83 Misc 2d 186, affd 50 AD2d 1088, affd 41 NY2d 60; NY State Bar Opn No. 479 (1978).

. The privilege may not be asserted when the communication relates to the commission of a future crime, or to advise the client to suppress or destroy evidence (United States v Gordon-Nikkar, 518 F2d 972, 975; United States v Goldenstein, 456 F2d 1006, 1011, cert den sub nom. Ray v United States, 416 US 943; Note, The Future Crime or Tort Exception to Communications Privileges, 77 Harv L. Rev 730), or to conceal wrong doing (Tierney v Flower, 32 AD2d 392; People ex rel. Vogelstein v Warden of County Jail of County of N. Y., 150 Misc 714, 720, affd 242 App Div 611; see, Tarlow, Witness For The Prosecution, A New Role for Defense Lawyer, Journal of Grim Def, vol 1, p 365, n 114; Clark v State, 159 Tex Cr Rep 187, cert den 346 US 855, reh den 346 US 905). The same result would follow, of course, if the attorney were to aid in impeding discovery of evidence (United States v Weinberg, 226 F2d 161, cert den 350 US 933; see, Sedler and Simeone, The Realities of Attorney-Client Confidences, 24 Ohio State LJ 1, 41). Lastly, there is the actual entrustment of evidence to the lawyer. (See The Right of a Criminal Defense Attorney to Withhold Physical Evidence Received from His Client, 38 U Chi L Rev 211, 213.)

. There is no need to go so far as to hold that the client bears the duty of taking precautions to protect the privilege (cf. Matter of Grand Jury Investigation of Ocean Transp., 604 F2d 672). It would, indeed, devitalize the privilege and render it too fragile if the client had to repeatedly preface his statements with admonitions of confidentiality (Matter of Trotta, 99 Misc 2d 278, 280).

. At this conversation Fentress dropped his earlier request for Wallace Schwartz to be there prior to the arrival of the police, and limited his expressed concern for the arrival of the rabbi and the police. For purposes of waiver of confidentiality (see point IV) it is of no importance. Fentress could have fixed any proposed sequence for the arrival of any number of people, police, or lawyers. As long as he affirmatively acknowledged, as he did, his expectation of the inevitable and imminent arrival of the police, any confidentiality, as to the corpus, was waived, and the court so finds.

. Naturally, the mere fact that Enid and Wallace Schwartz were related does not itself create agency (Persons Other Than Client or Attorney Affected by, or Included Within, Attorney-Client Privilege, Ann. 96 ALR2d 125, § 5) and the court finds no other evidence to justify any finding of agency.