*183 OPINION OF THE COURT
Harold B. Beeler, J.
Defendant is a Manhattan attorney whose practice consists largely of debt collection work for various businesses including Gralla Publications, a large magazine publishing company. The instant indictment stems from an alleged fraudulent scheme whereby the defendant in collusion with Stephen Weiss, who was then the credit manager of Gralla Publications, collected fees from Gralla for collections work not actually performed. Defendant was indicted along with Stephen Weiss and charged with grand larceny in the third degree (Penal Law § 155.35) and commercial bribery in the first degree (Penal Law § 180.08).
Defendant moved by written motion to inspect and dismiss the indictment on the ground that the evidence presented to the Grand Jury was legally insufficient to support the charges, in that the testimony of Robert Gurland who was one of several attorneys employed by defendant’s firm between 1990 and 1992, was the product of privileged attorney-client communications and was improperly presented to the Grand Jury. The Honorable Dorothy A. Cropper ordered an evidentiary hearing to be held to determine: "whether an attorney client privilege existed between the defendant and Mr. Gurland * * * and, if so, whether Mr. Gurland’s testimony in the Grand Jury was in any way violative of that privilege.” Pursuant to that order, this court presided over an evidentiary hearing on June 1-2, July 7 and July 13, 1994, followed by comprehensive posthearing written submissions by both parties. For the reasons outlined below this court finds that no attorney-client relationship existed between the defendant and Robert Gurland on September 9, 1992 or thereafter.
In New York, the attorney-client privilege has been codified under CPLR 4503 (a). It provides in pertinent part that: "Unless the client waives the privilege, an attorney * * * who obtains * * * evidence of a confidential communication made * * * in the course of professional employment, shall not disclose, or be allowed to disclose such communication * * * in any action.” The attorney-client privilege is firmly rooted in common law as a mechanism to encourage full disclosure between attorney and client. However, it also "constitutes an 'obstacle’ to the truth-finding process, the invocation of which should be cautiously observed to ensure that its application is consistent with its purpose” (Matter of Jacqueline F., 47 NY2d *184 215, 219 [1979] [citations omitted]). Accordingly, the privilege is both scrupulously honored and narrowly construed. (Matter of Priest v Hennessy, 51 NY2d 62 [1980].)
Both parties agree that the defendant upon learning of the criminal investigation spoke to Robert Gurland, an employee/ attorney about the investigation. However, not every communication to an attorney is privileged. (Misek-Falkoff v International Bus. Mach. Corp., 144 FRD 48 [SD NY 1990].) The attorney must be contacted in his capacity as an attorney, not as a colleague (United States v Davis, 131 FRD 391 [SD NY 1990]), nor as a friend. (People v O’Connor, 85 AD2d 92 [4th Dept 1982].) Moreover, the communication must have been made for the purpose of obtaining legal advice. (Boller v Barulich, 147 Misc 2d 502 [NY County 1990].) In this regard, it is the client’s intent and purpose which governs whether or not an attorney-client relationship is created. (Nachman v Nachman, NYLJ, Jan. 22, 1993, at 22, col 1 [Sup Ct, NY County].)
It is the burden of the party asserting the privilege to establish that it should apply. (People v Mitchell, 58 NY2d 368 [1983].) The defendant, as the moving party, must establish: (1) that an attorney-client relationship existed, that is, that he contacted the attorney in his capacity as an attorney to obtain legal advice or services; and, (2) that the information sought to be protected was a confidential communication made to the attorney for the purpose of obtaining legal advice or services. (People v Mitchell, supra.) The determination as to whether a communication is privileged depends on the particular facts and circumstances of each case. (Matter of Jacqueline F., supra.)
The evidence at the hearing established the following: Robert Gurland began working for the defendant part time in 1987. He was paid on a per diem basis as well as by a percentage of all debts he collected on behalf of defendant’s clients. Over the years a close social and business relationship developed between the two men. They would socialize regularly, and the defendant was someone in whom the defendant would confide office gossip and intimate personal matters. On several occasions, the two men also collaborated on business ventures unrelated to the work of defendant’s firm.
On September 9, 1992, when the defendant learned via a telephone call that his firm was being investigated by the New York County District Attorney’s office, he immediately sought *185 out Robert Gurland and asked him to accompany him to Stephen Weiss’s office. While en route, the defendant made a series of inculpatory comments, which formed the core of Gurland’s Grand Jury testimony. Framed mainly in the form of unanswered questions, the defendant in an "agitated” state, "rambled” about the criminal investigation: "what do you think I ought to do?”; "do you think I should give the money back?”; and "how could this thing have happened?”
Upon arriving at Weiss’s office, the defendant requested that Weiss, too, accompany him out, at which time he resumed the discussion/monologue about the impending investigation with all three present. Upon returning to his own office, the defendant made phone calls to various persons peripherally involved with his business to whom he repeated his inquiries about the investigation. He then sent Gurland to bring him the "specials”, 30 to 40 separate files organized in a single redweld folder all of which involved collection matters that the defendant personally was handling for Gralla. It was these files which were the subject of the District Attorney’s investigation. Upon delivering the files to the defendant, Gurland left the defendant and Weiss alone.
The following day, September 10, 1992, an Assistant District Attorney accompanied by several investigators executed a search warrant at defendant’s office. Initially, Gurland was the only attorney present. He examined the warrant and retrieved the Gralla files for the investigators. Sometime during the execution of the warrant, the defendant arrived. Defendant conferred directly with the Assistant District Attorney and then called Fred Hafetz, one of three criminal attorneys formally retained by the defendant.[1] Fred Hafetz came right over and before leaving told all of the firm’s employees, including Gurland, that he would represent them in connection with the investigation.
Over the next month the defendant continued to discuss the criminal investigation with Gurland; at some point, reviewing with him the "specials”. Sometime during this period, Robert Gurland retained his own counsel and began to cooperate with the District Attorney’s office, ultimately testifying against the defendant in the Grand Jury.
In this case the evidence regarding defendant’s intention when consulting Gurland is at best ambiguous. At no point *186 during the hearing was any direct evidence presented establishing an express attorney-client relationship. Robert Gurland categorically denied that such a relationship existed. The defendant elected not to testify.[2]
No retainer agreement or other type of financial arrangement was placed in evidence; nor was there any testimony that Mr. Gurland was compensated for legal services provided. While the defendant correctly states the law that the absence of a fee arrangement and the retention of other counsel do not preclude a finding that an attorney-client relationship existed (People v O’Connor; supra; People v Fentress, 103 Misc 2d 179 [Dutchess County 1980]; Nachman v Nachman, supra), their absence may certainly be considered when evaluating the defendant’s true intentions. Moreover, under the circumstances of this case, the court finds their absence quite significant since the defendant, unlike all of the "clients” in the cases cited by the defendant, is not a layperson, but an experienced attorney.
The defendant called two witnesses in addition to Mr. Gurland: Craig Sherar, a Florida attorney who regularly handled cases referred by the defendant, and Howard Doyle, a nonlawyer employee of the defendant’s. The People called Martin Rapaport, an attorney to whom the defendant often referred complex litigation, and who was retained by the defendant in connection with this criminal investigation soon after he learned about it. None of these witnesses testified to hearing an explicit conversation or declaration from Mr. Gurland or the defendant regarding the existence of an attorney-client relationship.
Defendant’s argument is that based upon the testimony of all the witnesses, there is substantial indirect evidence that an attorney-client relationship existed. The first category of evidence upon which the defendant relies is the conduct of the defendant in his conversations with Mr. Gurland on September 9, 1992. Focusing on the initial conversation between the two, the defendant claims that the substance of the conversation makes clear the defendant’s intention to consult Mr. Gurland in his capacity as an attorney. Through several inculpatory comments the defendant told Gurland about the criminal investigation, and ostensibly solicited his advice. *187 While the substance of this conversation is consistent with an attorney-client consultation, it is equally consistent with a conversation between friends, colleagues and even coconspirators.
The defendant further argues that the manner in which the conversation was conducted evinces the defendant’s intent to engage in a private, confidential conversation. Defendant entered Mr. Gurland’s office and without explanation directed him to accompany him out of the office. This behavior, too, could be interpreted as evincing the defendant’s desire to preserve the confidentiality of the communication, but for the fact that testimony established that the defendant often ordered Gurland as well as other employees to accompany him out of the office.
Moreover, immediately following his purportedly "confidential” conversation with Gurland, the defendant confided virtually all of the same information to Stephen Weiss and numerous other individuals peripherally related to his business, none of whom could be characterized as counsel. Even if these subsequent conversations do not extinguish defendant’s claim of privilege as a matter of law,[3] they certainly undermine the argument that the substance and manner of the conversation provides evidence of defendant’s intent to create an attorney-client relationship.
The defendant next cites certain actions taken by Mr. Gurland which he claims clearly demonstrate that he was acting as defendant’s attorney. Specifically, the defendant claims that Mr. Gurland supervised the execution of the search warrant and subsequently reviewed the "special” files with the defendant. Although accurate on its face, defendant’s characterization of Gurland’s role during this period is vastly overstated when viewed in the context of all the other steps being taken by the defendant and his retained counsel.
From the very outset, Gurland was excluded from conversations at the very same time that he was supposedly serving as counsel. For example, on September 9, 1992, after the first "privileged” conversation, Mr. Gurland retrieved the "specials” for the defendant and then left the defendant and *188 Stephen Weiss alone to review them. If reviewing the files with the defendant later on is some evidence of an attorney-client relationship, dropping them off and not participating in this initial meeting is strong evidence that Gurland was not serving as defendant’s attorney at that time.
The scenario when the search warrant was executed presents a similar picture. While it is clear that Mr. Gurland played some role in assisting the investigators, it is undisputed that defendant, himself, and then his formally retained counsel, Frederick Hafetz, took the lead in supervising the execution of the warrant as soon as each arrived at the office.
A third category of evidence proffered by the defendant is the testimony of witnesses regarding conduct and statements of Mr. Gurland which led them to believe that Mr. Gurland was representing the defendant. Craig Sherar testified to a number of conversations in which Mr. Gurland deflected questions about the case by stating: "We’re taking care of it and he [referring to the defendant] doesn’t want me to talk with anybody about it”. The People’s witness, Martin Rapaport, also testified to two conversations in which Mr. Gurland informed him that he was "advising” the defendant and sought to reassure himself that his advice was proper. Finally, Howard Doyle testified that he met with Mr. Gurland and the defendant and that Mr. Gurland prevented the defendant from discussing the facts of the case in his presence; and stated that he believed the District Attorney "had no case”.
All three witnesses testified that based upon Mr. Gurland’s statements and conduct, they believed that Mr. Gurland was acting as the defendant’s attorney. None, however, could testify to any conversation with the defendant or Mr. Gurland in which either explicitly stated that an attorney-client relationship existed. Rather, each witness relied on statements and conduct, which this court finds to be ambiguous and equivocal. For example, Mr. Gurland’s statement to Mr. Sherar that he was "working with the defendant on the case” does not specify in what capacity he was working. Once again, Mr. Gurland could have meant he was acting as an attorney, but it is equally possible that he meant he was working with him as a colleague or an employee. There is nothing in the statement which makes any one of the three more or less plausible. Similarly, Mr. Gurland’s various statements discouraging the defendant from discussing the case with others might be interpreted as legal advice, or they could be viewed as good judgment predicated on the advice he had received *189 from the attorney who he retained to represent him in connection with the investigation. In sum, even if all of the witnesses are believed to be credible as to what occurred and their belief that Mr. Gurland was acting as the defendant’s attorney, their testimony is not sufficient to establish that an attorney-client relationship existed between the defendant and Robert Gurland on or after September 9, 1992, especially in the absence of any concrete or affirmative evidence in the form of a retainer agreement or direct statement by either party.
Finally, and most significantly, this court heard testimony from Robert Gurland describing his legal background and long-standing relationship with the defendant. Through this testimony the court learned certain facts which the defendant as Mr. Gurland’s friend and employer had to know — that Robert Gurland, albeit licensed to practice law, lacked any of the experience or skills that would enable him to effectively advise the defendant with respect to a criminal investigation. Mr. Gurland was not a criminal attorney, and had never handled any type of litigation. Mr. Gurland’s testimony on this subject was clear: never in his entire legal career had he ever appeared in court, performed legal research or drafted legal memoranda or motions. His sole legal expertise consisted of the tasks incident to nonlitigated collections work, which in his own words, was not unlike those tasks performed by lay credit managers. Gurland’s limited legal skills were institutionally recognized and it was defendant’s consistent practice to refer all litigated matters to attorneys other than Gurland. Plainly, it is inconceivable that the defendant, an experienced attorney himself, would place his own life, liberty and professional reputation in the hands of a person he would not entrust with even the simplest litigated collection matter.
Whatever lay behind those conversations between the defendant and Robert Gurland on September 9, 1992, whether it was "agitated” "rambling” on the part of the defendant, or confidences told to a friend/employee, the one motive the defendant clearly did not have in seeking out Robert Gurland was to obtain legal advice.
Other steps taken by the defendant shortly after he learned of the investigation corroborate this finding. Once the defendant had pulled himself together he formally retained competent criminal counsel, who referred him to even higher powered criminal counsel. With each attorney the defendant entered into a formal retainer agreement and paid a fee. Once *190 again, the retention of other counsel does not preclude a finding that an attorney-client relationship existed between the defendant and Gurland (Nachman v Nachman, supra); it is, however, a factor to be considered when evaluating defendant’s true intentions.
Having heard all of the evidence and reviewed all of the written submissions of the parties, this court finds that under all the facts and circumstances there is insufficient credible evidence that the defendant intended to enter into an attorney-client relationship with Robert Gurland. Accordingly, the communications between them were not privileged and were properly presented to the Grand Jury. Defendant’s motion to dismiss the indictment for legal insufficiency is denied.

. The other two attorneys retained by the defendant were Martin Rapaport and Stanley Arkin.

. It should be noted that prior to the hearing, both parties stipulated that should the defendant testify at the hearing, his testimony could not be used against him at trial (Simmons v United States, 390 US 377 [1968]).

. Since the court finds that no attorney-client relationship existed on September 9, 1992, it does not reach the question of whether such a privilege would have been waived in view of defendant’s repeating the substance of the conversation to third parties. (People v Osorio, 75 NY2d 80 [1989]; People v Fentress, 103 Misc 2d 179, supra.)