OPINION OF THE COURT
Theodore G. Barlow, J.
In this proceeding before the December, 1978 Additional Grand Jury, the court is asked to rule on a witness’ contention that he is excused from answering certain questions put to him by the Special Assistant Attorney-General to the Deputy Attorney-General for Medicaid fraud on three asserted grounds of justification.
In furtherance of its investigation into an alleged scheme to defraud the Medicaid program, the Special Assistant Attorney-General to the Deputy Attorney-General for Medicaid fraud subpoenaed Rabbi Führer (the witness) to appear before the Richmond County Grand Jury to testify to the possible involvement of the yeshiva of which he is administrator in such illegal scheme. The witness was given transactional immunity.
It is the prosecutor’s belief, and his presentation to the Grand Jury seeks to establish, that the witness’ yeshiva has been used to launder moneys paid as kickbacks by a number of nursing home vendors to the operators of nursing homes. In his affirmation, the prosecutor states that:
*317 "Rabbi Führer, an administrative employee of [the Yeshiva] agreed with * * * an employee [the Employee] of [a Nursing Home] * * * to a scheme whereby [the Employee] would bring to Rabbi Führer checks payable to the * * * Yeshiva. These checks were from several vendors to nursing homes located on Staten Island.
"At a later date, Führer would deposit these checks into the accounts of the * * * Yeshiva, and return approximately 90 per cent of the proceeds in cash to [the Employee]. [The Employee] would then forward this cash to [his Employer], the operator of the [Nursing Home], as well as several other nursing facilities. [The Employer] had originally importuned nursing home vendors to make these payments to the * * * Yeshiva. These payments, made to appear as legitimate charitable contributions, were, in fact, disguised kickbacks to [the Employer].”
In his testimony, the witness acknowledged that a check for $500 payable to the yeshiva and drawn on a nursing home vendor, was received and deposited by the yeshiva. Beyond this acknowledgement, however, the witness has refused to answer questions put to him. Specifically, the witness was asked, and refused to answer, the following:
"Did someone physically hand you these checks?
"Were you ever in personal possession of these checks?
"Did you deposit these checks into the accounts of the Yeshiva?
"Was a percentage of these checks returned or given to anyone?
"Was there a laundering scheme in effect sometime between 1972 and 1975?
"Did [the Yeshiva] keep the proceeds of these various checks which are purportedly or which seem on their faces to be contributions to the Yeshiva?
"Was [the Employer] recipient of most of the funds reflected in these checks? Was he the ultimate recipient?”
The witness has refused to answer these and other questions of similar tenor and requests that this court excuse him from answering, setting forth three grounds as justification for excusing him: first, that to compel him to answer these inquiries would violate his right, as embodied in the United States and New York State Constitutions, to freely exercise his religion; second, that CPLR 4505, the clergyman- *318 penitent privilege, is applicable and prevents disclosure of these assertedly privileged communications; and, third, that section 35.05 of the New York Penal Law is applicable and justifies committing what would "otherwise” be an offense. For the reasons set forth below, the court rejects all of these contentions, and directs the witness to respond to the questions propounded.
Addressing itself first to the constitutional issue, the court is fully aware of the preferred position which the free exercise of religion is said to enjoy among freedoms given constitutional protection. (See, e. g., Matter of Brown v McGinnis, 10 NY2d 531, 536.) Notwithstanding this preferred position, however, it is well settled that the right to free exercise of one’s religion is not absolute. While the freedom to believe is absolute, freedom to act is not. "Conduct remains subject to regulation for the protection of society.” (Cantwell v Connecticut, 310 US 296, 304; see, also, e. g., La Rocca v Lane, 37 NY2d 575, 583.) Where it is asserted that governmental action impermissibly treads on one’s right to freely exercise one’s religion, a balance must be struck weighing the governmental interest to be served against the claimed infringement of one’s First Amendment rights. (Cf. Wisconsin v Yoder, 406 US 205, 214-215.) To prevail, the asserted State interest must be compelling, i.e., of the highest order. (Wisconsin v Yoder, supra, p 215.)
In striking this balance, the court assumes that the witness’ testimony, given under compulsion, will violate his sincerely held religious beliefs; moreover, the court is aware of the fact that the witness has been admonished by the Central Rabinnical Congress of the United States of America and Canada to refrain from responding to the prosecutor’s interrogatories, under penalty of excommunication. This fact, however, begins rather than ends the inquiry. The issue is whether the State’s interest in compelling the witness to respond to these questions is "subordinating” and "compelling”, and thus of sufficient magnitude to override this incidental impingement on the witness’ First Amendment freedom.
The State is seeking to uncover and prosecute an alleged scheme to defraud the Medicaid program. To this end, the prosecutor is presenting evidence to the Grand Jury, a part of such evidence being the testimony sought to be elicited from the witness. The Grand Jury holds a high place as an instrument of justice. (See, e. g., Branzburg v Hayes, 408 US 665, *319 686; People v Woodruff, 26 AD2d 236, affd 21 NY2d 848.) Corruption in the nursing home industry is of public concern (see, e. g., Matter of Sigety v Hynes, 38 NY2d 260). No citation is needed to support the proposition that such corruption should be uncovered where possible.
The court is of the opinion that when these competing interests are weighed, the scales tip in the State’s favor and compel disclosure by the witness. To permit the witness to thwart the Peoples’ interest in prosecuting corruption in the nursing home/Medicaid area on the ground that answering the prosecutor’s questions would violate his religious beliefs "would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances.” (Reynolds v United States, 98 US 145, 167.) As the court noted in a similar context, "The community is entitled to the assistance and information of its members in seeking out and controlling the commission of crime. 'Every man owes a duty to society to give evidence when called upon to do so. This rule applies particularly to a criminal prosecution’ ”. (People v Woodruff, supra, pp 238-239.) The witness’ religious beliefs "must give way to the dominant right of the State to maintain peace and order. If it were otherwise, the fabric of society might be pierced and fatally rent by a religious belief sincerely held by an individual * * * damaging to the continuing existence of peace and order” (People v Woodruff, supra, p 239; see, also, Smilow v United States, 465 F2d 802; Matter of Williams, 269 NC 68).
Moreover, the present case deals with an allegation by the prosecutor that the yeshiva and the witness have themselves participated in the alleged scheme. To say, as the witness does, that he may withhold any information he has concerning said scheme because disclosure would violate his religious beliefs, does violence to the constitutional protection which he asserts. Indeed, section 3 of article I of the New York Constitution, which is the State’s version of guaranteed religious freedom, expressly states that "the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state.” The protection afforded by the Constitution is not a shield, to be used to cover up criminal acts. (Cf. Branzburg v Hayes, 408 US 665, 691-692, supra.) In this *320 regard, Mr. Justice Douglas has stated: "If a group is engaging in acts or a course of conduct that is criminal, it can be prosecuted, and it and its members can be investigated, save as the Self-Incrimination Clause * * * sets up a barrier.” (Gibson v Florida Legislative Comm., 372 US 539, 571-572, Douglas, J., concurring.)
Turing to the witness’ claim that the testimony which the prosecutor seeks to elicit involves privileged communication under CPLR 4505, the clergyman-penitent privilege, the court is unpersuaded that CPLR 4505 applies to the facts of the instant case.
This statute states, in relevant part, that "a clergyman * * * shall not be allowed [to] disclose a confession or confidence made to him in his professional character as spiritual advisor.”
While the cases state that the statute is to be interpreted broadly and liberally (see, e. g., People v Shapiro, 308 NY 453), and that it is not necessary the communicant be a member of the church (see Kohloff v Bronx Sav. Bank, 37 Misc 2d 27), it does not necessarily follow that all communications to a clergyman are privileged (cf. Matter of Honigman, 8 NY2d 244; Richardson, Evidence [10th ed], § 425). Indeed, to rise to that level afforded protection under the statute the communication to the clergyman must be in his professional character as spiritual advisor (cf. Matter of Honigman, supra, p 252; see, also, Matter of Keenan v Gigante, 47 NY2d 160; People v Gates, 13 Wend 311, 323-324). Although this, apparently, is the test to be employed in deciding whether or not a given communication to a clergyman is confidential and, therefore privileged under the statute, there are no New York cases of which the court is aware which define what a clergyman’s "professional character as spiritual advisor” means. Although it does not mean that only confessions which are compulsory under religious doctrine are protected (see Richardson, Evidence [10th ed], § 425), neither does it mean, as already stated, that all communications to a clergyman are privileged.
The court is persuaded that to come within the protection of the statutory clergyman-penitent privilege, the communication in question must have been made with the purpose of seeking religious counsel, advice, solace, absolution or ministration. (See United States v Wells, 446 F2d 2; Burger v State, 238 Ga 171.)
It thus becomes clear that the privilege has no application *321 to the case at bar. None of the questions propounded to the witness appear to involve "spiritual” matters. Nor is there any indication that the testimony sought involves communications made for the purpose of seeking "religious * * * counsel, advice, solace, absolution or ministration.” (United States v Wells, supra, p 4.)
CPLR 4505 is therefore of no avail to the witness. Moreover, equally applicable to the resolution of this issue is the court’s earlier statement that the privilege is not to be used as a shield to cover up criminal activities in which the clergyman himself is allegedly involved.
The witness’ third asserted ground for excusing him from testifying is that the circumstances of the present case necessitate and justify the witness’ refusal to respond to the questions in issue.
Section 35.05 of the New York Penal Law is the State’s general justification statute, and is derived from section 3.02 of the American Law Institutes’ Model Penal Code. (See People v Brown, 70 Misc 2d 224, 228; Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY Book 39, Penal Law, § 35.05, p 83.) The witness places great emphasis on, and quotes at length from, the Model Penal Code’s language. What is controlling, however, is the New York statute; and that statute is narrower than the Model Penal Code and is to be narrowly construed. (See People v Brown, supra, pp 229-230; Hechtman, Practice Commentaries, ibid.)
Section 35.05 of the Penal Law states in relevant part that:
"Unless otherwise limited * * * conduct which would otherwise constitute an offense is justifiable and not criminal when * * *
"2. Such conduct is necessary as an emergency measure to avoid an imminent public or private injury which is about to occur by reason of a situation occassioned or developed through no fault of the actor” (emphasis added).
A narrow construction of this statute inescapably leads to the conclusion that the circumstances of the case at bar do not come within the narrow application of this section. While the court is aware that if the witness answers the questions put to him he will do so in violation of the commands of the rabbinical court and suffer repercussions, perhaps as harsh as the loss of his rabbinical status, with accompanying injury to his conscience and congregation, the fact of the matter is the *322 prosecutor alleges that the witness and the yeshiva have themselves participated in the scheme under investigation; such being the case it would strain credulity to hold that the injury which the witness seeks to avoid has resulted from "a situation occasioned or developed through no fault of the actor” (Penal Law, § 35.05, subd 2) and justifies the witness’ noncompliance with the law. Section 35.05 of the Penal Law is therefore of no avail to the witness.
For the foregoing reasons, the court directs the witness is to answer the questions propounded by the prosecutor.