THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GERALD O'CONNOR, Appellant.

Fourth Department, February 26, 1982

**APPEARANCES OF COUNSEL**

*Gerald O'Connor*, appellant *pro se.*

*Donald O. Chesworth, District Attorney (Glenda Brayman* of counsel), for respondent.

**OPINION OF THE COURT**

SIMONS, J. P.

As a result of killing his former girlfriend, defendant has been convicted after a Bench trial of manslaughter, first degree, and criminal possession of a dangerous weapon. Shortly after the killing, defendant called an Assistant District Attorney who had formerly been his personal attorney, admitted the killing and asked the attorney to arrange his surrender to police. At the trial these admissions were received in evidence, as was a confession defendant made to police after he surrendered. The primary issues on this appeal are whether the court erred in receiving these statements because (1) the admissions to the

Assistant District Attorney constituted a privileged communication (CPLR 4503) and (2) defendant's statement to police was obtained in violation of his constitutional right to counsel (see *People v Marrero,* 51 NY2d 56; *People v Hobson,* 39 NY2d 479; *People v Arthur,* 22 NY2d 325). Central to both issues, of course, is the question whether defendant established an attorney-client relationship with the Assistant District Attorney. There should be an affirmance. Defendant has failed to establish that he consulted the Assistant District Attorney for the purpose of obtaining legal advice or services (see *Matter of Priest v Hennessy,* 51 NY2d 62).

Defendant had lived with the victim, Patty Manz, periodically for several years and had fathered a child by her. About six weeks before the homicide, their relationship had soured because the victim believed that he had stolen her stereo console. She filed a larceny complaint against defendant and threw all of his clothes out of the house. Defendant, emotionally distraught over the possibility of losing his girlfriend and going to jail, spent most of the day before the killing with a friend named Helen Abraham, ingesting drugs and alcohol. During that time he displayed a pistol to Ms. Abraham and tested it by firing it into her living room baseboard. At about 6:00 P.M., after twice telling her that he intended to kill Patty, he left Ms. Abraham and went to the victim's house. After arguing with her, he shot her in the head from short range. She died from the wound seven days later. The victim's daughter, who was in the house at the time, witnessed the argument and the shooting.

About 9:00 P.M. defendant returned to the Abraham house and told Ms. Abraham that he had shot Patty. He made some telephone calls from there in an attempt to obtain money so that he could leave Rochester and he then left at about 9:45 P.M. Around midnight defendant telephoned Louis Vallone, an Assistant District Attorney of Monroe County, at his home. Defendant told Vallone that he had killed Patty Manz and, at Vallone's suggestion, he made arrangements to surrender.

Defendant opened the telephone conversation, Vallone recalled, by stating: "This is Jerry — I am in trouble."

Vallone asked what had happened and defendant said, "I just shot Patty." Vallone then told defendant to "consider turning himself in" and defendant said that he wanted to do so but was afraid the police would shoot him on sight. Vallone offered to go with him to protect him, but defendant wanted to think about it and call back. During this first call, defendant also said that he shot Patty because he was drinking and was afraid that he would be going to jail and Patty would be dating someone else. Defendant called Vallone back 20 minutes later and asked if Patty had died. Vallone said he would check the hospital. Defendant called again 10 minutes later and Vallone told him that Patty was still alive. Defendant then agreed to turn himself in but said he wanted to see Patty first. Vallone said that he would try to arrange it and he then called the police who agreed to take defendant to the hospital. When defendant called again, Vallone told him to come to his (Vallone's) house and he would be taken to the hospital. Defendant never appeared at Vallone's house and did not call again. He was subsequently arrested at Ms. Abraham's house the next day.

At the trial Vallone testified to these admissions and defendant challenges the trial court's ruling receiving the evidence over defendant's claim that the communication was privileged.

I

The attorney-client privilege is now codified in CPLR 4503 but it is deeply rooted in the common law. It is based upon a considered public policy to encourage full disclosure between an attorney and his client (see *Upjohn Co. v United States,* 449 US 383, 389; *Matter of Priest v Hennessy,* 51 NY2d 62, 67-68, *supra*). Recognition of this privilege, however, excludes evidence which has a high degree of reliability, it stands in derogation of the public's "right to every man's evidence" (8 Wigmore, Evidence, § 2192, at p 70) and for that reason it has not been without its critics (see Fisch, New York Evidence [2d ed], §§ 516, 517; 5 Weinstein-Korn-Miller, NY Civ Prac, par 4503.01). Thus, it has been frequently said that the privilege "ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle" (8 Wigmore,

Evidence, § 2291, at p 554; see, also, *Matter of Priest v Hennessy, supra,* p 68; *Matter of Jacqueline F.,* 47 NY2d 215, 219-222; *Finn v Morgan,* 46 AD2d 229, 234; *People ex rel. Vogelstein v Warden of County Jail of County of N. Y.,* 150 Misc 714, 720, affd 242 App Div 611; *Matter of Horowitz,* 482 F2d 72, 81-82).

There have been a number of formulations of the rule (see *People v Belge,* 59 AD2d 307, 309, and cases cited; see, generally, Richardson, Evidence [10 ed], § 412; Fisch, New York Evidence [2d ed], §§ 518, 519; 8 Wigmore, Evidence, § 2292), but the Court of Appeals has stated that the privilege attaches when an attorney-client relationship has been established and the information sought to be protected from disclosure is a confidential communication made to the attorney for the purpose of obtaining legal advice or services. (*Matter of Priest v Hennessy, supra.*) The client must consult the attorney as an attorney, not as a friend or to engage him for nonlegal matters (see, e.g., *Rosseau v Bleau,* 131 NY 177, 183 [attorney employed as a scrivener]; *Lifschitz v O'Brien,* 143 App Div 180 [attorney employed to procure a loan on real estate]). The relationship is not established because one pays a legal fee (*Matter of Priest v Hennessy, supra*), or lost because the client does not pay a fee (*Bacon v Frisbie,* 80 NY 394) and neither the fact that the parties have had an attorney-client relationship in the past (*People v Hess,* 8 App Div 143), nor that they may have such a relationship in the future (*Rintelen v Schaeffer,* 158 App Div 477, 484, affd 219 NY 620) is determinative. Whether the relationship exists or not is determined by the client's purpose in contacting the attorney. Its existence at the time of the communication is a matter to be resolved by the court and the party who asserts the privilege bears the burden of establishing each element of it (*Matter of Priest v Hennessy, supra,* pp 68-69).

Turning then to the facts of this case -

Defendant's acquaintance with Vallone dated back to 1963 or 1964 when Vallone, then in private practice, was assigned to represent him on a criminal charge. Vallone did not represent defendant again thereafter although defendant contacted him while he was on the prosecutor's staff. When defendant did contact Vallone, Vallone told

him that he was an Assistant District Attorney, that he could not represent him and he referred him to other attorneys for advice. Nevertheless, defendant continued to call Vallone from time to time to discuss his problems. For example, on one occasion defendant was threatened with arrest because of a bad check. He called Vallone and Vallone told him to make the check good. Vallone's suggestion is not readily characterized as either legal advice or the advice of a friend, but it is clear that no attorney-client relationship was established by the contact, nor could it be since the advice came from the prosecutor's office (see *Kitz v Buckmaster,* 45 App Div 283). There can be no question that defendant knew that to be so for not only had Vallone told him he was an Assistant District Attorney but when defendant called in the past his calls were made to the District Attorney's office and he had also visited Vallone there to discuss his problems.

Thus, when defendant called Vallone on the night of the killing and made the incriminating admissions, he was not a client of Vallone's and was not seeking to become one. He had been advised long before that that Vallone could not represent him (see *People v Hess,* 8 App Div 143, *supra;* see, also, *Kitz v Buckmaster,* 45 App Div 283, *supra; People v Fentress,* 103 Misc 2d 179). Moreover, it appears from the conversation that he did not seek legal advice or assistance of Vallone. Manifestly, his call to Vallone was made for nonlegal purposes, to learn if the victim was still alive, to see her at the hospital if possible and to arrange for his safe surrender to police. The fortuitous circumstance that Vallone had represented defendant 11 years earlier, or even that he may have given him legal advice in the more recent past, is of no consequence since that representation had no relation to the communication which is claimed to be privileged here (see *Matter of Priest v Hennessy,* 51 NY2d, at p 71). Accordingly, defendant's statements to Vallone should be viewed as those made to any other law enforcement officer for any other purpose (cf. *People v Ortiz,* 54 NY2d 288).

The trial court did not specifically rule on whether an attorney-client relationship had been established. Rather, it held that defendant waived any claim of privilege when

he voluntarily repeated the incriminating statements that he had made to Vallone to the police officers who later interrogated him. In other words, it held that he could not have intended the information be confidential because he voluntarily disclosed it to others. Defendant contends that he could not waive the attorney-client privilege in the absence of counsel, citing *People v Hobson* (39 NY2d 479, *supra*). This argument, however, confuses waiver of the constitutional right to counsel in a criminal proceeding with the waiver of the statutory attorney-client privilege. While it is well established in New York that a defendant cannot waive his constitutional right to counsel once it attaches without his attorney being present *(People v Skinner,* 52 NY2d 24; *People v Marrero,* 51 NY2d 56, *supra*), no such limitation has been imposed upon a waiver of the attorney-client privilege. The privilege is not constitutionally guaranteed but is a statutory provision embodying the substance of a common-law rule of evidence (*Upjohn Co. v United States,* 449 US 383, 389, *supra; People ex rel. Vogelstein v Warden of County Jail of County of N. Y.,* 150 Misc 714, 720, affd 242 App Div 611, *supra*), and a defendant who voluntarily discloses privileged communications to police before trial waives the privilege of confidentiality (see *People v Hitchman,* 70 AD2d 695; Richardson, Evidence [10th ed], § 418).

In short, defendant did not contemplate the possibility of Vallone representing him on the criminal charge here and the trial court correctly denied the privilege and admitted the relevant conversation into evidence not only on that ground but also on the ground of waiver.

## II

Defendant also contends that his constitutional right to counsel was abridged when the police accepted his waiver of his *Miranda* rights in the absence of counsel and took a lengthy statement from him. He cites *People v Marrero* (51 NY2d 56, *supra*) in support of his contention, but that case is critically different from this one. In *Marrero* the attorney was private counsel, hired for the limited purpose of surrendering defendant to the police. The Court of Appeals held that notwithstanding the limited nature of the re-

tainer, defendant's *Miranda* waiver in the absence of counsel was not effective. It refused to examine the technicalities of the private limitation placed on the retainer by Marrero's lawyer and held that Marrero, by hiring him, had manifested his "'view that he [was] not competent to deal with the authorities without legal advice'" (*People v Marrero, supra,* at p 59). No such inference can be drawn here. Defendant had not retained a lawyer to represent him in any capacity in this case. When he called Vallone he knew that Vallone could not represent him and that Vallone was one of the "authorities" who were searching for him. The call was made so that the surrender could be made without danger, not because defendant contemplated legal advice. Significantly, in describing the events of the evening to the police, defendant did not refer to Vallone as his counsel but stated that he had called some friends, including "Mr. Vallone, the Assistant District Attorney".

Nor do we find the statement to police or any part of it involuntary because the police discontinued their interrogation in the station house for a short time while defendant led them to the place where he had discarded the gun so that it could be retrieved. Defendant was fully advised of his *Miranda* rights at the commencement of questioning and no further advisement was required upon returning to the station house after the temporary break to retrieve and identify the weapon.

### III

Finally, while the court may have improperly circumscribed defense counsel's cross-examination of Helen Abraham, any error in this respect was harmless beyond a reasonable doubt in view of the overwhelming evidence of guilt.

We have considered defendant's other claims of error and find them without merit.

The judgment should be affirmed.

HANCOCK, JR., CALLAHAN, DENMAN and SCHNEPP, JJ., concur.

Judgment unanimously affirmed.