82 N.Y.2d 603 (1993)
627 N.E.2d 959
606 N.Y.S.2d 879
The People of the State of New York, Respondent,
v.
Elias Carmona, Appellant.
Court of Appeals of the State of New York.
Argued October 7, 1993.
Decided December 20, 1993.
Gary E. Eisenberg, Monroe, for appellant.
Carl A. Vergari, District Attorney of Westchester County, White Plains (Bruce Edward Kelly and Maryanne Luciano of counsel), for respondent.
Chief Judge KAYE and Judges SIMONS and LEVINE concur with Judge TITONE; Judge SMITH concurs in result in a separate opinion in which Judges HANCOCK, JR., and BELLACOSA concur.
*605 TITONE, J.
On March 15, 1987, Olga Estremera was killed in defendant's apartment. Following that slaying, defendant fled to Miami, Florida, where he confessed to police after consulting with two clergymen. The issue in this appeal from the affirmance of defendant's homicide conviction is whether the inculpatory contents of his conversations with the clergymen were properly admitted against him at trial. Resolution of this issue requires consideration of whether those conversations *606 were privileged under CPLR 4505 and, if so, whether the courts below properly concluded that defendant's privilege had been waived when defendant, who was by then the subject of an outstanding bench warrant, turned himself in and, in essence, told the authorities what he had told the two clergymen.

I.
The privilege question was considered in limine during defendant's pretrial Mapp-Huntley-Wade hearing. At that time, Detective Julio Torres, the Miami officer who took defendant's confession, testified that the police had been contacted by a Reverend Hernandez, who stated that he was with someone who wanted to confess to a New York murder. While one officer went to pick that individual up, Torres discovered that the person in question was the subject of an arrest warrant in New York that had been issued in connection with the Estremera homicide.
When defendant arrived at the Miami police station, Torres administered Miranda warnings and, after obtaining "waivers" of defendant's Miranda rights, elicited a detailed statement about how defendant had strangled Estremera in New York and had then fled the jurisdiction. Torres testified that, during his interview with defendant, defendant told him that he had given the same inculpatory information to Reverend Hernandez and one of Hernandez's associates, Reverend Mimoso. By stipulation, Torres was permitted to read his police report into the record.
Torres's report recounted an interview between Torres and William Jaramillo, who had met defendant and spoken with him shortly after defendant had arrived at the bus terminal in Miami. The report stated:
"[Defendant] told [Jaramillo] * * * that he had a problem[,] * * * that he was a crack dealer and had killed someone. * * * During the time that [defendant] conversed with [Jaramillo], [defendant] cried.
"[Jaramillo] is a member of Rev. Hernandez's church and while he talked to [defendant], he talked about God. [Defendant] told him that he had grown up in the church and he became involved in dealing drugs when he left the church. [Jaramillo] then referred [defendant] to Pastor Hernandez."
Torres, who had interviewed Reverends Hernandez and *607 Mimoso, also testified that, according to the two clergymen, defendant had agreed to surrender himself after "they talked to him and * * * convinced him that the right way to do it was to be remorseful about it, and [told him] that if he was going to [be] following the rules of God, * * * the right thing was to turn himself in." Also admitted were the transcripts of sworn statements by Hernandez and Mimoso, which had been given to Detective Torres when he questioned the two ministers. Hernandez's statement indicated that he had had a telephone conversation with defendant before meeting him in which defendant stated "that he had a problem and that he needed spiritual help." According to both Hernandez's and Mimoso's statements, defendant first "opened up" to Hernandez when the two men were talking in Hernandez's garden after Hernandez and Mimoso had taken defendant to a church service. Defendant subsequently told Reverend Mimoso his inculpatory story at Reverend Hernandez's urging.
A sworn statement given by defendant to Detective Torres on the day he surrendered was also admitted at the hearing. In this statement, defendant described how he had decided to turn himself in because the "reverends * * * could not accept [him since he] was not in good standing in their laws." Defendant further described how he had "prayed and * * * was crying a lot" before he made the final decision.
On the basis of this evidence, the trial court concluded that defendant's statements to Reverends Hernandez and Mimoso were "of a spiritual and confidential nature, and therefore would initially fall within the ambit of privilege." However, the court went on to conclude that defendant had waived his privilege by relating the "full content" of the privileged communications, particularly since "defendant advised Detective Torres that his statements were the same subject matter that he had imp[a]rted to the two Reverends." Accordingly, the statements defendant had made to Reverends Hernandez and Mimoso were admissible, although, as the People conceded, defendant's statements to Detective Torres, which were made without benefit of counsel, were not (see, People v Samuels, 49 N.Y.2d 218). The court declined to adopt defense counsel's argument that the violation of his State right to counsel affected the admissibility of his statements to the two ministers. Notably, the People did not argue, here or in the trial court, that the right to counsel analysis should be different because defendant was interrogated by the police in *608 another jurisdiction that does not necessarily follow the Samuels rule.
Defendant was promptly tried and the jury found him guilty of second degree murder. On his appeal, the Appellate Division affirmed after rebuffing defendant's contention that the trial court had erred in admitting the testimony of Reverends Hernandez and Mimoso in evidence. The Appellate Division agreed with the trial court's conclusion that although the communications between defendant and the two clergymen were privileged, the privilege had been waived when defendant "voluntarily repeat[ed] the substance" of those communications to the police (186 AD2d 214, 214-215). We now reject the lower courts' conclusion that in these circumstances defendant's CPLR 4505 privilege was effectively waived. We nonetheless conclude that the judgment of conviction was properly affirmed because, in view of the virtually air-tight circumstantial evidence of guilt, the error in the admission of the clergymen's testimony was harmless.

II.
CPLR 4505 provides: "Unless the person confessing or confiding waives the privilege, a clergyman, or other minister of any religion or duly accredited Christian Science practitioner, shall not be allowed to disclose a confession or confidence made to him in his professional character as a spiritual advisor." Although often referred to as a "priest-penitent" privilege, the statutory privilege is not limited to communications with a particular class of clerics or congregants. Nor is it confined to "penitential admission[s] * * * of a perceived transgression" or avowals made "`under the cloak of the confessional'" (concurring opn, at 623, 624, quoting Matter of Keenan v Gigante, 47 N.Y.2d 160, 166). On the contrary, in enacting CPLR 4505, the Legislature intended to recognize "the urgent need of people to confide in, without fear of reprisal, those entrusted with the pressing task of offering spiritual guidance" (Matter of Keenan v Gigante, supra, at 166) without regard to the religion's specific beliefs or practices.
While the privilege may have "ha[d] its origins in the Roman Catholic sacrament of Penance, in which a person privately confesses his or her sins to a priest [and t]he priest is enjoined by Church law * * * to maintain the confidentiality of the confession," the New York statute is intentionally *609 aimed at all religious ministers who perform "significant spiritual counselling which may involve disclosure of sensitive matters" (Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 4505, at 683). Indeed, the drafters of the current codification struck the concluding phrase from the predecessor provision, which made the privilege applicable to communications made "in the course of discipline, enjoined by the rules or practice of the religious body to which he belongs" (see, Civ Prac Act § 351), because the phrase was ambiguous and rendered it "doubtful whether the rule applies to any confessions other than those to a Catholic priest" (Second Preliminary Report of Advisory Comm on Prac and Pro, 1958 NY Legis Doc No. 13, at 93). Accordingly, what is more appropriately dubbed the "cleric-congregant" privilege is applicable to ministers of all religions, most of which have no ritual analogous to that of the Catholic confession (see, Alexander, op. cit., at 683). Despite the concurrence's "four canon" analysis, New York's test for the privilege's applicability distills to a single inquiry: whether the communication in question was made in confidence and for the purpose of obtaining spiritual guidance (Matter of Keenan v Gigante, supra, at 166).
Of course, not every communication between a cleric and a congregant will justify application of the privilege. It has been held, for example, that disclosures made to a rabbi for the purpose of obtaining his assistance in securing an attorney and a favorable plea bargain are not privileged under the statute (People v Drelich, 123 AD2d 441). Similarly, no privilege attached where the purported congregant went to a priest to apologize to him in the latter's secular capacity as a victim and the congregant then solicited the priest's aid in contacting an attorney (People v Schultz, 161 AD2d 970; see also, Matter of N. & G. Children [Alberto G.], 176 AD2d 504). The common thread in these cases is that the privilege may not be invoked to enshroud conversations with wholly secular purposes solely because one of the parties to the conversation happened to be a religious minister.
Viewed against these standards, the evidence at defendant's pretrial hearing was plainly sufficient to support the trial court's finding, which was impliedly adopted by the Appellate Division, that the conversations between defendant and the two Miami ministers were privileged. As was indicated by Officer Torres's report, defendant was referred to Reverend Hernandez after talking to William Jaramillo about *610 God and about how he had gotten involved with destructive narcotics only after he had fallen away from his own church. Additionally, Reverend Hernandez's sworn statement indicated that defendant had specifically agreed to speak with him because defendant "had a problem" and "needed spiritual help."[1] Hernandez then referred defendant to Mimoso for further consultation.
This evidence suffices to support the trial court's inference that defendant's contact with Reverends Hernandez and Mimoso had been initiated for the purpose of obtaining spiritual guidance and solace. Furthermore, the evidence from defendant's own sworn statement that he had "prayed and * * * was crying a lot," had bared his soul only after attending a church service and had discussed his standing under religious laws with the two ministers justifies the inference that their conversations were of a spiritual nature. That defendant waited until he and Reverend Hernandez were alone in the latter's garden before "opening up" to him and agonized before making the decision to turn himself over to police are factors which the lower courts were entitled to consider in determining that the communications between defendant and the ministers were intended to be confidential. In view of the evidence derived from Detective Torres's report and the sworn statements of the two ministers as well as defendant himself, the fact that defendant did not give live testimony at the hearing or present evidence of his own is not fatal to his claim that the disputed communications were privileged (see, concurring opn, at 624).[2]

*611 III.
Having concluded that the lower courts did not err in finding that the communications among defendant and Reverends Hernandez and Mimoso were privileged under CPLR 4505, we turn now to the question whether that privilege was waived. Although it is clear that an express waiver is no longer required under the current statute (see, Second Preliminary Report, op. cit., at 92, 93), this Court has not extensively discussed the nature of the conduct required to establish an implied waiver. Here, it is argued that defendant's conduct in imparting the contents of his conversations with the two ministers to the police constituted such a waiver. Alternatively, it is suggested that such a waiver should be implied at least to the extent that defendant conveyed to the police both the contents of his statements to the two ministers and the fact that he had made those statements to them. We have no occasion to resolve the merits of these arguments, however, since we conclude that, under the circumstances of this case, recognition of any waiver defendant may have made would be inconsistent with the principles and purposes underlying the exclusionary rule.
It is undisputed that a warrant had been issued for defendant's apprehension in connection with the Estremera slaying and that, accordingly, the indelible right to counsel had attached at the time he surrendered and gave his incriminating statements to the police (see, People v Samuels, supra). It is also undisputed that, as the trial court ruled, these statements were inadmissible, except for impeachment purposes, because they were given without benefit of the advice of counsel.
The People contend that the suppression of defendant's statements to police does not preclude a determination that defendant effectively waived his CPLR 4505 privilege, even though their claim of waiver was based solely on the suppressed statements. We conclude, however, that the People cannot rely on the suppressed statements to establish a waiver. Since the purported waiver flowed from the same *612 wrong and is conceptually inseparable from the statements that were suppressed as a result of that wrong, it should be denied legal effect to the same extent that the underlying statements are denied recognition as admissible evidence in chief. Any other view would permit the People to do indirectly what they cannot do directly  i.e., make positive use of an official illegal act. Such a "backdoor" use of an illegality would run counter to the underlying purpose of the suppression rule: to deter official misconduct by eliminating any benefit that may flow from it. Accordingly, to the extent that a waiver occurred, it should not have been accorded legal effect, and the testimony of Reverends Hernandez and Mimoso regarding defendant's confidential inculpatory statements to them should not have been admitted at trial.

IV.
It remains for us to determine whether the error in the admission of the two ministers' testimony constituted reversible error in the context of this trial. Resolution of that question requires a close look at the trial evidence.
According to that evidence, defendant had been romantically involved with the victim, Olga Estremera, for several months before she was killed. Santos Lopez, a witness for the People, testified that on the day of the murder defendant had told him that he was angry with Estremera because she had stolen some money from him and because she was a "snitch."
In the early evening hours of March 15, 1987, the day of the crime, Estremera had been seen by two witnesses, Dorothy Stephens and David "Poppy" Hawkins, entering defendant's apartment, leaving it and then returning. After she entered the apartment for the second time, defendant closed the door and the nearby witnesses heard the door lock being engaged. Shortly thereafter, Stephens heard defendant and Estremera screaming and the sounds of what Stephens believed to be someone being beaten. Hawkins, who was "working" as a lookout for defendant's drug business at the time, confirmed that the sounds of a melee were emanating from the apartment. When Hawkins knocked on the door, he heard defendant say "Poppy, no more, no more," a direction that he construed to mean that there was no further need for his services that day. According to Hawkins, the disturbance inside the apartment lasted about 15 minutes. Stephens, who had been standing in front of defendant's door for at least an *613 hour before the incident, stated that she saw no one beside Estremera enter or leave defendant's apartment.
After the commotion in the apartment had subsided, Hawkins saw three individuals, Martinez, Lopez and Cruz, separately entering and then leaving defendant's apartment. Martinez testified that, after hearing defendant say "I am pissed off, I am going to kill someone," he knocked on defendant's door, gained admittance to the apartment and promptly ran downstairs when he saw what he thought was blood on defendant's face. When defendant emerged from the apartment himself, he was seen wearing a long-sleeve pullover shirt and jacket. Another witness, Marvin Barnett, looked through his window, saw defendant exiting his building and watched as defendant came over to his own building. Defendant approached Barnett and demanded money from him. During their conversation, Barnett saw blood on defendant's hands.
The police were alerted by Estremera's nephew, who told them that screams and fighting had been heard inside defendant's apartment. Having entered with the assistance of the building superintendent's helper at approximately 8:00 P.M., the responding officers saw Estremera's still warm body, which was tied and wrapped in two blankets. According to the County Medical Examiner, Estremera had been strangled and stabbed.
The People's trial evidence also included testimony by William Jaramillo, the person who had noticed defendant at the Greyhound bus terminal and had referred him to Reverend Hernandez. According to Jaramillo, defendant volunteered that he had "killed somebody" when Jaramillo approached him to determine whether he needed help or solace.
Defendant testified at trial in his own defense, stating that an individual named William Ramirez had been in his apartment when Estremera arrived. Defendant left when the two began to argue about some money that Ramirez had ostensibly left at Estremera's house. When he returned some 40 minutes later, Ramirez told defendant that he had strangled Estremera with an electric cord and ordered him to lie down on the body. Later, Ramirez indicated that he intended to lay the blame for the killing on defendant.
Defendant then travelled to his sisters' homes in Brooklyn and New Jersey, telling each that he had been accused of a slaying in Yonkers  a version of events that his sisters confirmed. He ultimately travelled by bus to Miami, where he *614 met Jaramillo and the Reverends Hernandez and Mimoso. However, he denied telling any of these men that he had killed someone.
The defense also introduced the detailed confession defendant had given to Detective Torres after he had turned himself in to the Miami police. Although the statement had been ruled inadmissible as part of the People's evidence in chief, the court had made it clear that the statement would be admissible on cross-examination should defendant choose to testify. When questioned by his attorney about the statement, defendant stated that he had been interrogated "harshly" although he was weak and that he had finally given a confession in part because he wanted to sleep and in part because he was afraid that Ramirez would harm his family if he did not take the blame for Estremera's murder. Defendant's testimony about his interrogation was contradicted by the People's rebuttal witness, Detective Torres, who stated that defendant had given no indication of being tired or stressed when he was questioned by the Miami police.

V.
Since the erroneously admitted evidence involved a confession of guilt by the accused, we must perform our harmless error inquiry with particular sensitivity to the fact that confessions are "probably the most probative and damaging evidence" that can be introduced against a defendant (Bruton v United States, 391 US 123, 139 [White, J., dissenting], quoted in Arizona v Fulminante, 499 US 279, 292 [White, J., dissenting]). Even in light of that principle, however, we find no need for reversal in defendant's case.
The circumstantial evidence furnished by several bystanders established that defendant was in the apartment when Estremera entered it for the last time, that he was there for the duration of the melee, which ended in silence, and that Estremera was not seen alive again. A witness who was immediately outside of defendant's apartment during the relevant time frame saw no one else enter or leave, and two witnesses testified that they saw blood on defendant's hands and face. Even without defendant's confession,[3] this evidence *615 was so damning as to dwarf the significance of the Hernandez and Mimoso testimony. When this evidence is added to the other evidence of defendant's animosity toward Estremera, his murderous mood, his statement to Jaramillo that he had killed someone, his disguised flight,[4] and his own implausible and internally inconsistent version of events,[5] the basis of the jury's verdict is clear, and it can fairly be said that the error was harmless regardless of what standard for harmless error is applied (see, People v Crimmins, 36 N.Y.2d 230). This is especially so in light of the fact that defendant's statements to Hernandez and Mimoso that he had fled New York because he had choked two women with an electric cord were inconsistent with the known facts before the jury. Thus, it is unlikely that the jury gave those statements significant weight. Hence, reversal is not required.
Accordingly, the order of the Appellate Division should be affirmed.
SMITH, J. (concurring).
The issues here are whether the testimony of two ministers was received at trial in violation of defendant's statutory priest-penitent privilege[1] despite the fact that defendant denies making any confession to them, whether he waived that privilege, if it is applicable in this case, and whether defendant's account of his statements to the two ministers is precluded in any event as a violation of his constitutional right to counsel. We agree that the order of the Appellate Division upholding the murder conviction should be affirmed but do so for reasons different from our colleagues.
No priest-penitent privilege was ever invoked or established in this case. Thus, no reason exists to find error and decide this case on harmless error grounds. Neither defendant nor the two ministers to whom he allegedly confessed testified at the in limine hearing following which the court decided to admit the testimony of the two ministers. When defendant *616 took the stand at his trial, he denied ever telling the two ministers that he had killed a woman in New York. Thus, in order to recognize a priest-penitent privilege here, the majority must conclude that defendant was lying when he denied confessing the killing to the two ministers. Despite his testimony, the Court invokes defendant's personal priest-penitent privilege for him.
Moreover, we disagree with the majority in another, equally fundamental, respect. Even assuming for the sake of argument that the priest-penitent privilege had been properly invoked, the privilege was nullified, as held by Supreme Court and the Appellate Division, by the voluntary conduct of defendant. He acted contrary to the very essence of the privilege by discussing the subject matter of the purportedly confidential communication with third persons (see, 8 Wigmore, Evidence § 2285 [McNaughton rev 1961]; Richardson, Evidence §§ 418, 425 [Prince 10th ed]; and see, e.g., People v Figueroa, 173 AD2d 156, 159; Matter of Rivera v Coughlin, 133 AD2d 694, 695; People v O'Connor, 85 AD2d 92, 97; People v Fentress, 103 Misc 2d 179, 191-196). Defendant's actions in publishing the purportedly confidential communication to third persons, including a bus station clerk and Florida police officers, can effect a "waiver of a statutory right" that does not require the presence of counsel under People v Samuels (49 N.Y.2d 218) and People v Settles (46 N.Y.2d 154). To suggest otherwise manifests a misconception of the conceptually different and distinct bases for the priest-penitent privilege and the constitutional right to counsel for waiver of constitutional rights purposes under People v Samuels and People v Settles.

I
Defendant's conviction for murder in the second degree arose from the death by strangulation of his girlfriend in March 1985, in Yonkers, Westchester County. After the killing, defendant left New York City and went to Florida. In the bus station in Miami, he encountered a Greyhound ticket clerk by the name of William Jaramillo. He related to the clerk that he was involved with drugs and with killing someone. At that point, Jaramillo called his pastor, Reverend Jose Hernandez. He and another pastor, Hector Mimoso, a former police detective, arrived at the bus station. Defendant eventually confessed to the ministers that he had murdered two women in Yonkers. The ministers convinced defendant to turn *617 himself in to the police. Defendant did so and, following Miranda warnings, gave oral and written statements to the Florida police admitting to a murder in Yonkers. Defendant also related to the police the substance of what he told the ministers.
Prior to the jury trial, defendant moved, inter alia, to suppress physical evidence and identification evidence. During the course of the hearing, defendant's statements to the Florida police and the priest-penitent issue were considered. Several police officers, including Miami-Dade Police Officer Detective Julio Torres, testified. Defendant presented no evidence. Following the hearing, the court, with no opposition from the People, suppressed defendant's statements to Detective Torres on the People's direct case. The court ruled that the statements could be admitted for impeachment purposes. Those rulings are not in issue before us.
The hearing court ruled further that statements made by defendant to Reverend Hernandez and Reverend Mimoso were privileged. The court concluded, however, that defendant's gratuitous and voluntary confession of the full content of the privileged communications to Detective Torres constituted a waiver of the privilege by defendant. The testimony of the two ministers was admitted into evidence on the People's direct case. Defendant's statements to the Florida police, which included his statements to the ministers, were admitted into evidence on defendant's direct case.
At the trial, the testimony of several witnesses established defendant's connection to the murder. Dorothy Stephens and David Hawkins stated that they saw the victim, Olga Estremera, enter defendant's apartment and heard the sounds of screaming and the sounds of Estremera being thrown about the apartment. Alfredo Martinez testified that around the time of the killing he saw what he thought was blood on defendant's face. Marvin Barnett stated that at approximately the same time as the killing, he saw blood on the hand and fingertips of defendant.
William Jaramillo, Reverend Jose Hernandez and Reverend Hector Mimoso testified concerning the priest-penitent privilege. William Jaramillo testified that when he saw defendant at the Greyhound bus station in Miami, he realized that defendant was "in a deep need" and asked defendant to come over to the ticket counter. Jaramillo stated that he spoke with defendant and repeatedly reassured him that God loved him. *618 Defendant told Jaramillo about his problems with drugs, and also "mentioned killing somebody." At that point, Jaramillo felt that he was no longer able to help defendant and referred him to his pastor, Reverend Jose Hernandez.
Reverend Hernandez testified that defendant told him and Reverend Hector Mimoso that he killed his girlfriend, and they urged him to turn himself in to the police.
In his own defense, defendant testified to the following: He rented an apartment at 150-152 Elm Street, Yonkers, from the man who owned that building and a nearby grocery store. He was married and the victim had been "[his] mistress" for approximately eight months prior to her death. On the day of the killing, he invited William Ramirez, whom he met that day, to his apartment at 150-152 Elm Street. Sometime later, Ramirez arrived at his apartment and argued with the victim about the fact that his wallet, documents and money that he had left at the victim's house were missing. Defendant left Ramirez and the victim in the apartment for approximately 40 minutes and went to a corner store to buy beer. When he returned to his apartment, Estremera had already been killed by Ramirez, who told him that he had killed the victim because she had stolen $2,000 from him. Ramirez threatened to kill defendant and his family if defendant did not take the blame for the killing.
Defendant testified further that he told his sisters in Brooklyn and New Jersey that he had been accused of a death in Yonkers. Next, he purchased false identification and a Greyhound bus ticket to Miami, and, for the next three days, rode a bus to Miami. On his arrival, defendant met a Greyhound ticket clerk named William Jaramillo, and two ministers, Reverend Hernandez and Reverend Mimoso.
According to defendant, he told Jaramillo that he had been charged with a killing in Yonkers, New York. Jaramillo gave him the number of Reverend Hernandez, and, when he met with Reverend Hernandez, defendant stated that he had been accused of a death in Yonkers. Defendant denied telling Jaramillo or either pastor that he had killed someone. Defendant stated further that after his arrest, he spoke to the police. Defendant testified that the police conducted a harsh interrogation and that he asked repeatedly not to be questioned because he was very weak. Defendant testified further that he gave a signed confession, which was offered by him and admitted into evidence, because he wanted to rest in jail *619 and because he did not want Ramirez to kill his family. Defendant denied killing the victim. He stated that the details of his confession were either supplied by Ramirez or made up.
It should be emphasized that, pursuant to the ruling of the hearing court, the People did not attempt to admit into evidence on their direct examination defendant's statements to the police. Rather, defendant's attorney elicited the evidence of those statements on examination of defendant. Only after defendant had testified on direct examination did the People question defendant about his statements to the police.
On rebuttal, Detective Torres testified as follows:[2] On March 22, 1987, at approximately 2:40 P.M., defendant was taken into custody from the home of Reverend Hernandez. At approximately 5:30 P.M. on that day, Detective Torres met defendant and administered Miranda warnings to him. Defendant signed a form waiving his right to have an attorney present. According to Detective Torres, at no time did defendant indicate that he was unwilling to give a statement. Detective Torres questioned defendant about what occurred and defendant gave answers, from which Detective Torres made notes. Thereafter defendant gave an oral statement confessing to Estremera's murder.
According to Detective Torres, defendant's statement consisted of the following: Defendant knew the victim for several years but had been intimate with her only in the last seven months. The victim was a police informant and had threatened to tell the police that he was a drug dealer. On the night of the killing, after the victim gave him "black beauty" pills, he beat and strangled her. Defendant stated that he then told his two sisters what had happened. Defendant then took a Greyhound bus to Miami where he became acquainted with William Jaramillo. Defendant told Jaramillo about the homicide and Jaramillo introduced him to two ministers. Defendant told the ministers what had happened in New York and they told him that he should turn himself in. Defendant agreed and asked one of the ministers to telephone the police. *620 Thereafter, defendant gave a similar sworn, stenographically recorded statement. Detective Torres testified that defendant did not express an unwillingness to continue with the interview, and no one coerced defendant into giving the statements. Detective Torres testified further that when he took the statements, he was not aware that a New York warrant had been issued for defendant's arrest.
The jury found defendant guilty of murder in the second degree. The Appellate Division affirmed, agreeing that defendant had waived his priest-penitent privilege by voluntarily repeating to Detective Torres the substance of his admissions to the ministers (186 AD2d 214). A Judge of this Court granted leave to appeal.

II
On this appeal, defendant argues that the statements to the two ministers should not have been admitted at trial because (1) he never waived the clergy-penitent privilege, and (2) his statements to Detective Torres were taken in violation of his right to counsel.
Turning first to the right to counsel argument, a "defendant's right to counsel attache[s] when [a] felony complaint [is] filed and [an] arrest warrant issued" (People v Samuels, 49 NY2d, at 221, supra). Where formal judicial proceedings have begun, "there may be no waiver of the right to counsel unless an attorney is present" (People v Settles, 46 NY2d, at 166, supra; People v Samuels, supra). Thus, statements obtained from a defendant in the absence of counsel after the filing of a felony complaint and the issuance of an arrest warrant should be suppressed (see, People v Samuels, supra).
Here, a warrant for defendant's arrest was issued prior to his interrogation by the police. The People concede that the Metro-Dade Police Department violated defendant's right to counsel by interrogating him after a New York arrest warrant had been issued for him. They urge, however, that since defendant impliedly waived his statutory priest-penitent privilege by voluntarily recounting the otherwise privileged communication to the police, his statements to the clergy should not be suppressed. The People contend further that defendant offered no evidence at the hearing on the priest-penitent privilege and thus failed to establish his burden that the communications were intended to be confidential.
The availability of the priest-penitent privilege "depends not *621 on the contents of the privileged communication but rather on the character of the communication, the relationship between the parties to it and the circumstances under which it was made." (Majority opn, at 610-611, n 2.) The Samuels/Settles right to counsel, in contrast, recognizes that the assistance of counsel is essential once a criminal prosecution has been commenced because then the "defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law" (Kirby v Illinois, 406 US 682, 689). The voluntary act of defendant in doing something adverse to the confidential "character of the communication"  i.e., divulging it to third persons either publicly or privately  has no relationship to the rationale for the Samuels/Settles constitutional right, the need for protection from the "prosecutorial forces of organized society" (Kirby, 406 US, at 689, supra). This distinction was perceived by the Court in People v O'Connor (85 AD2d 92, supra). There, in rejecting the defendant's claim that he could not waive the attorney-client privilege in the absence of counsel, the Court stated that the argument "confuses waiver of the constitutional right to counsel in a criminal proceeding with the waiver of the statutory attorney-client privilege" (id., at 97).
Nor does it matter that defendant's actions in making public the confidential communication were statements to the police instead of, for example, to a newspaper reporter. To the police statements, themselves, the Samuels/Settles right, of course, does attach, and the police are precluded from testifying to their content. But what is involved here is not the content of the statements to the police but solely the fact that defendant took steps which broke the seal of confidentiality, thereby wiping out the basis for the privilege and making it possible for the priests to testify to what defendant said to them in alleged confidence (see, People v Figueroa, 173 AD2d, at 159, supra; People v Fentress, 103 Misc 2d, at 191-196, supra). The expansion of the Samuels/Settles rationale into these circumstances is not justified by logic and precedent. Moreover, it contradicts the approach concerning indirect invocation of our counsel rules (see, People v Bing, 76 N.Y.2d 331). While the majority does not expressly state that it is expanding the right to counsel rule in Samuels to situations involving a priest-penitent privilege, in effect, that is what it is doing because the testimony of the clergy members is being suppressed (see, majority opn, at 612).

*622 III
While it would be unnecessary to deal with the waiver issue if we were to conclude, as three of us do, that the privilege was not invoked, it will be addressed in view of the development of the issue among the members of the Court. Waiver of the priest-penitent privilege may be express, "upon the trial or examination by the person confessing" (Matter of City Council v Goldwater, 284 N.Y. 296, 300; see also, Richardson, Evidence § 425, at 419 [Prince 10th ed] [commenting on former Civ Prac Act §§ 351, 354]) or by implication, upon the "voluntary public or private disclosure before trial of the privileged communication" (Richardson, Evidence § 418, at 413 [Prince 10th ed]).
The parties do not dispute that there was no express waiver of the priest-penitent privilege in this case. Defendant asserts that there was no waiver by implication because he could not waive the priest-penitent privilege in the absence of counsel. Defendant misconstrues waiver of the constitutional right to counsel in a criminal proceeding with the waiver of the statutory priest-penitent privilege. While this Court has stated repeatedly that a defendant cannot waive his constitutional right to counsel once it attaches, in the absence of counsel (see, People v Skinner, 52 N.Y.2d 24; People v Marrero, 51 N.Y.2d 56), we have made no such declaration regarding the waiver of the statutory priest-penitent privilege. That privilege is not constitutionally guaranteed, but rather, was created to encourage and protect confidential communications to members of the clergy in their spiritual capacity (see, Matter of Keenan v Gigante, 47 N.Y.2d 160, 166; People v Shapiro, 308 N.Y. 453, 458). A defendant who voluntarily discloses privileged communications not only to the police but to others before trial waives the privilege of confidentiality (see, Richardson, Evidence § 418, at 413 [Prince 10th ed]; cf., People v O'Connor, 85 AD2d 92, 97, supra [defendants may waive their statutory attorney-client privilege without their attorney being present]). Here, defendant's voluntary disclosure to the civilian Jaramillo and the police of communications with the two ministers, coupled with his responses to one of the ministers as that minister telephoned the police that the murder had been committed in Yonkers, constituted an implied waiver of the statutory priest-penitent privilege, if such a privilege ever existed.

*623 IV
No priest-penitent privilege existed at common law (see, Matter of Keenan v Gigante, 47 N.Y.2d 160, 166, supra; see generally, 8 Wigmore, Evidence § 2394 [McNaughton rev 1961]). The privilege attaching to communications to clergy is, however, codified in CPLR 4505 and provides, "Unless the person confessing or confiding waives the privilege, a clergyman, or other minister of any religion or duly accredited Christian Science practitioner, shall not be allowed to disclose a confession or confidence made to him in his professional character as spiritual advisor." "[T]he Legislature by enacting CPLR 4505 and its predecessors responded to the urgent need of people to confide in, without fear of reprisal, those entrusted with the pressing task of offering spiritual guidance so that harmony with one's self and others can be realized" (Matter of Keenan v Gigante, 47 NY2d, at 166, supra). To be sure, the statute does not render a communication privileged merely because it has been made to a clergyman (see, id.). Rather, for the privilege to attach, there must exist a "`reason to believe that the information sought required the disclosure of information under the cloak of the confessional or was in any way confidential'" (id., at 166).
"[S]tatutes bestowing an evidentiary privilege should be construed in furtherance of their `policy to encourage uninhibited communication between persons standing in a relation of confidence and trust'" (id., at 167). The privilege belongs to the penitent, and it is the penitent who must establish the statutory confidentiality of the communication (see, People v Schultz, 161 AD2d 970, 971; see also, People v Osorio, 75 N.Y.2d 80, 85; People v Mitchell, 58 N.Y.2d 368, 373). The propriety of the privilege may be tested by the four canons already established for privileged communications (8 Wigmore, Evidence § 2396, at 878 [McNaughton rev 1961]).[3] First, the communication must originate in a confidence of secrecy and the penitent must evince an intent to have the communication remain confidential (see, People v Johnson, 115 AD2d 973; see also, 8 Wigmore, Evidence § 2396 [McNaughton rev 1961]). Second, the confidentiality of the communication must be essential to *624 the relation "for it is only confidential communications made to a clergyman in his spiritual capacity which the law endeavors to protect" (Matter of Keenan v Gigante, 47 NY2d, at 166, supra; 8 Wigmore, Evidence § 2396 [McNaughton rev 1961]). Thus, for the privilege to apply, the communication must be made to a member of the clergy for the purpose of "seeking religious counsel, advice, solace, absolution or ministration" (Matter of Fuhrer, 100 Misc 2d 315, 320, affd sub nom. Matter of Fuhrer v Hynes, 72 AD2d 813). Third, the penitential relation must deserve recognition and countenance (8 Wigmore, Evidence § 2396 [McNaughton rev 1961]). While it is not essential that the penitent be a member of the same place of worship from which he or she seeks spiritual guidance (see, Matter of Fuhrer, supra; see also, Richardson, Evidence § 425, at 418 [Prince 10th ed]), the communication in question must be penitential in character or must be made to the clergyman "under the cloak of the confessional" (Matter of Keenan v Gigante, supra, at 166). Stated differently, the terms "confession" and "confidence" contemplated by the statute refer to penitential admission to a clergyman of a perceived transgression while seeking religious or spiritual guidance, and apply to voluntary confessions or confidences as well as those made pursuant to a religious decree. Fourth, the injury to the penitential relationship from compulsory disclosure must be greater than the benefit to justice (8 Wigmore, Evidence § 2396 [McNaughton rev 1961]). For example, the statutory priest-penitent privilege cannot be used as a shield to cover up criminal activities in which a clergyman is allegedly involved (Matter of Fuhrer, supra).
None of these four canons by which privileged communications may be tested was established. Defendant did not testify at the hearing or present any evidence. The majority's conclusion that the privilege was established can rest solely on the basis of Detective Torres' hearing testimony. Detective Torres testified only that defendant made a decision to turn himself in; that it was defendant's decision and not that of the ministers. The only other evidence at the hearing dealing with the clergy-penitent privilege issue was two affidavits by the ministers, Reverend Hernandez and Reverend Mimoso, introduced solely for comparison with Detective Torres' testimony and defendant's statements made to Detective Torres.
Defendant's statements do not show that he intended to exercise the priest-penitent privilege, nor do they show that he intended that the statements remain confidential. In his *625 oral statement to Detective Torres, defendant said nothing to establish a priest-penitent privilege. In that oral statement, defendant admitted that he told Jaramillo that he had killed a woman. Defendant also stated orally that he admitted to the ministers that he had killed the woman.
The evidence at the hearing did not show that defendant communicated with the clergyman for the purpose of spiritual guidance. Reverend Hernandez's affidavit indicated that when they initially met at the bus station, defendant sought spiritual advice as a result of his problem. At that time, however, defendant did not confide in him. Although defendant eventually spoke with Hernandez the next day, he gave him false information regarding the crimes (that he had killed two women) and never revealed to Hernandez the purpose for his communication. Thus, this evidence, on any interpretation, fails to meet defendant's burden to prove the privilege.
Similarly, Reverend Mimoso's statement fails to specify the purpose of defendant's communication to him. Actually, Mimoso stated that Reverend Hernandez contacted him because Hernandez knew Mimoso was a former police officer.
Ultimately, neither of the clergyman's affidavits, both containing hearsay statements, supports a finding of an attempt by defendant to protect his communications with them. While the majority asserts that the statements of the ministers were not admitted solely for the purpose of comparing them with the testimony of Detective Torres (see, majority opn, at 610, n 1), a fair reading of the record shows otherwise. Thus, neither the testimony of Detective Torres, nor the affidavits (assuming those affidavits had been admitted on the merits) establishes the personal invocation of the priest-penitent privilege or any of the four canons for testing the exercise of that privilege.

V
It should be emphasized that the majority finds a priest-penitent privilege even though defendant never took the stand at the hearing and notwithstanding the fact that at trial, defendant testified that he never told the ministers that he killed anyone. Defendant's testimony at trial is thus wholly inconsistent with a priest-penitent privilege. No case cited by the majority and none decided by this Court grants the benefits of the priest-penitent privilege to a defendant who denies under oath that he made to the religious leader the confession sought to be suppressed.
*626 Contrary to the position of the majority, I cannot agree that defendant's trial testimony has no relevance to the issue of the clergy-penitent privilege (see, majority opn, at 610-611, n 2). First, the issue of whether or not a discussion with members of the clergy should be suppressed arose from a request for a ruling from the court, in limine, that is, a preliminary ruling. The assumption was that defendant had made an incriminating statement to members of the clergy on a confidential basis and for spiritual purposes. In the face of defendant's declaration that he never made such a statement, there is no basis to protect a nonexistent spiritual need and a nondeclared confidential communication.
Second, this case does not involve an issue on which the People have the burden of proving a clergy-penitent privilege. That burden was on the defendant. People v Dodt (61 N.Y.2d 408), cited by the majority as precluding consideration of defendant's trial testimony, does no such thing. There was no testimony by defendant in that case either at a pretrial identification hearing or at a trial. The Court held that the Appellate Division had erred in making a finding of independent source based solely upon evidence at trial. A new trial was ordered, preceded by a hearing on independent source. The case does not stand for the proposition that trial evidence cannot be considered on an issue such as the clergy-penitent privilege here, where a court has ruled based upon a set of facts (a presumption of defendant's admission of guilt to a member of the clergy) which are inconsistent with defendant's own position. While there is no evidence that counsel for defendant misled the court by seeking a ruling based on a priest-penitent privilege, defendant should not profit from a privilege which his own testimony indicates was never acquired.
Moreover, this case is unlike Simmons v United States (390 US 377, 394), where the Supreme Court held that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." There, the Supreme Court was concerned with two constitutional rights, the right to be free from unreasonable searches and seizures and the right not to incriminate oneself. It held that one constitutional right could not be sacrificed (testifying at the hearing) by the assertion of another (the right not to testify at trial). Here, a purely *627 statutory privilege is involved and there is no surrender of one constitutional right by the assertion of another.
In sum, defendant did not lay a proper foundation to invoke the priest-penitent privilege and if he had, the evidence demonstrates that he impliedly waived that privilege. The trial court did not err in receiving the testimony of the two ministers.
Accordingly, while the order of the Appellate Division should be affirmed, it is not necessary to do so by reaching the issue of harmless error.
Order affirmed.
NOTES
[1] Contrary to the concurrence's assertion that Reverends Hernandez's and Mimoso's sworn statements were introduced "solely for comparison with Detective Torres' testimony" (concurring opn, at 624), a subsequent passage in the transcript reveals that they were in fact admitted for the purpose "incorporated into the objective of th[e] hearing"  i.e., the resolution of the privilege and waiver questions. The statements' use was limited only to the extent that they were not to be "admitted into evidence for the truth of the[ir] content."
[2] The concurrence's reliance on defendant's trial testimony, specifically his denial that he confessed the murder to the two ministers, is misplaced. First, since that testimony was not part of the hearing evidence and was therefore not before the court when it made its determination, it is not relevant to the correctness of that determination and is not a proper subject for consideration on this appeal (see, People v Dodt, 61 N.Y.2d 408), regardless of which party had the burden of proof on the contested issue (see, concurring opn, at 626). Second, even if defendant's testimony were somehow relevant, it would not provide a basis for denying his CPLR 4505 privilege, since the availability of a privilege depends not on the contents of the privileged communication but rather on the character of the communication, the relationship between the parties to it and the circumstances under which it was made. Finally, defendant's decision to take the witness stand and deny having confessed murder to the ministers could well have been a strategic choice made in direct response to the trial court's ruling that the ministers' testimony would be admissible. Accordingly, defendant's trial testimony cannot logically be invoked as a hindsight ground for reevaluating the trial court's pretrial ruling.
[3] It cannot be determined whether defendant's decision to testify and his counsel's concomitant decision to introduce defendant's confession to Torres as a preemptive measure were influenced by the trial court's in limine ruling permitting the use of Reverends Hernandez's and Mimoso's testimony. Thus, the confession to Torres should not be considered for purposes of this harmless error analysis.
[4] There was evidence that defendant had dyed his hair a different color, obtained fake identification and assumed a different name before arriving in Miami.
[5] On one occasion, defendant stated that he had known the "real" killer, Ramirez, for a month and had shared the keys to his apartment with him. On another occasion, defendant stated that he had just met Ramirez on the day of the murder.
[1] The privilege is sometimes referred to as the clergy-penitent privilege.
[2] Detective Torres also testified on the People's direct case that on March 22, 1987, at approximately 5:30 P.M., several officers from the Metro-Dade Police Department brought defendant into the department. Detective Torres was asked to serve as an interpreter to obtain certain background information from defendant. Detective Torres testified further that the police recovered from defendant a copy of a birth certificate issued in Puerto Rico, a Greyhound bus ticket, a Greyhound luggage ticket, a New Jersey driver's license, and a check stub, all bearing the name of Jose Velazquez.
[3] While the applicability of the four canons in Wigmore to New York State is questioned (majority opn, at 609), it is hard to imagine which of the four is not applicable to the priest-penitent privilege as it exists in this State. The said canons are simply a summary and analysis of the clergy-penitent privilege as it exists in this State.